Herman LODGE et al.,
Plaintiffs-Appellees,

v.

J. F. BUXTON et al., Defendants,

Ray DeLaigle et al.,
Defendants-Appellants.

No. 78–3241.

United States Court of Appeals,
Fifth Circuit.
Unit B

March 20, 1981.

E. Freeman Leverett, Elberton, Ga., Preston B. Lewis, Jr., Waynesboro, Ga., for defendants-appellants.

David F. Walbert, Atlanta, Ga., Robert W. Cullen, Augusta, Ga., Laughlin McDonald, Neil Bradley, H. Christopher Coates, Atlanta, Ga., for plaintiffs-appellees.

Thomas M. Keeling, J. Gerald Hebert, Attys., Dept. of Justice, Washington, D. C., for amicus curiae U. S. A.

Before JONES, FAY and HENDERSON, Circuit Judges.

FAY, Circuit Judge:

Plaintiff class, consisting of all Black residents of Burke County, Georgia, brought this action to have that county's system of at-large elections declared invalid as violative of the First, Fourteenth and Fifteenth Amendments to the United States Constitution and Title 42 U.S.C. §§ 1971 and 1973. The District Court for the Southern District of Georgia held for the plaintiffs, on the grounds that the at-large election process was maintained for the purpose of limiting Black access to the political system in violation of their Fourteenth and Fifteenth Amendment rights. Accordingly, the District Court ordered that the existing system of at-large elections be abandoned and that the county be divided into five districts with each district electing one county commissioner. We affirm the judgment of the District Court in all respects.

## FACTS

This case arose in Burke County, a large and predominantly rural county in southern

Georgia. In fact Burke County is the second largest of Georgia's 159 counties in terms of the area it encompasses.[1] Burke is similar to many rural counties in Georgia in that its economic base is predominantly agricultural. The county's population is somewhat over 10,000 people, a slight majority of whom are Black.[2] No Black has ever been elected to the county commission in Burke County.

This suit was filed in 1976 by various named plaintiffs as representatives of the class of all Black residents of Burke County.[3] It alleged that the county's system of at-large elections violated plaintiff's First, Fourteenth and Fifteenth Amendment rights, as well as their rights under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and the Reconstruction Act,

42 U.S.C. § 1971, by diluting the significance of the Black vote, thereby unconstitutionally restricting their right to meaningful access to and participation in the electoral process.

After a trial, during which both parties offered voluminous evidence in support of their respective positions, the District Court held for plaintiff. The court concluded that the at-large system had been maintained for the purpose of limiting Black participation in the electoral process. The court entered an order, setting forth the findings of fact and conclusions of law, requiring Burke County to elect five county commissioners, one from each of five districts into which the county was to be divided.[4] The court's order of October 26, 1978 was to be effectuated by the time of the general elec-

---

1. Burke County is 832 square miles in area, making it approximately the size of two-thirds of the State of Rhode Island.

2. The following population table is taken from the District Court's findings of fact and conclusions of law:

| YEAR [c] | TOTAL POPULATION | PERCENTAGE WHITE [b] | [a] BLACK |
|---|---|---|---|
| 1975 | 18,700 | 42% | 58% |
| 1970 | 18,248 | 40% | 60% |
| 1960 | 20,596 | 34% | 66% |
| 1950 | 23,458 | 29% | 71% |
| 1940 | 26,520 | 25% | 75% |
| 1930 | 29,224 | 22% | 78% |

[a]
Percentage is to the nearest whole percent.

[b]
The "percentage white" figure includes a category labelled "foreign born white"; the greatest number in this group was 42, in 1930. After 1930, this statistic apparently was not kept.

[c]
The 1975 figures are a mid-census estimate taken from plaintiffs' exhibit 191.

---

In addition, the record indicates that the disparity in size between the White and Black residents of Burke County has continued to decrease since 1975, so that the current Black majority is very slight.

3. The class was actually certified by Judge Alaimo on May 12, 1977, some eleven months after suit was filed.

4. The following table shows a breakdown of the population of the districts in the plan selected by the District Court as to race and voting age and percentage deviation by district:

| District | Total Population | Black Population (%) | | White Population(%) | | % Deviation |
|---|---|---|---|---|---|---|
| 1 | 3,736 | 2,899 | (77.6) | 837 | (22.4) | +2.3 |
| 2 | 3,673 | 2,753 | (74.9) | 920 | (25.1) | +0.5 |
| 3 | 3,595 | 1,914 | (53.2) | 1,681 | (46.8) | −1.6 |
| 4 | 3,590 | 1,852 | (51.6) | 1,738 | (48.4) | −1.7 |
| 5 | 3,661 | 1,570 | (42.9) | 2,091 | (57.1) | +0.3 |

tion on November 8, 1978. The District Court denied defendant's motion for a stay of that order pending the outcome on appeal. On October 27, 1978, this Court also denied defendant's motion for a stay pending appeal. On November 3, 1978, Justice Powell granted defendant's motion for a stay pending final disposition of the appeal by this Court.

*ISSUES PRESENTED*

Appellant asserts that the District Court erred by applying an incorrect legal standard in assessing appellee's constitutional rights. Appellant contends that the District Court did not and could not find that the at-large electoral system was created or maintained for the purpose of limiting Black participation in that system, as required by the Supreme Court in the recent decision of *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Appellant contends that, while the operation of the system may have had the affect of limiting Black participation, the system was not designed or maintained to so operate.

In response, appellee offers various bases for affirming the District Court's judgment. They contend that the trial court correctly found the requisite degree of purposeful or intentional maintenance of a discriminatory system within the meaning of the Supreme Court's decision in *Bolden* and *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37

L.Ed.2d 314 (1972). They assert, alternatively, that inability to meaningfully participate in the electoral system violates a fundamental liberty interest within the meaning of the First Amendment. They contend that Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 and the Reconstruction Act, 42 U.S.C. § 1971(a)(1) proscribe at-large voting systems having a discriminatory effect, without regard to the purpose or intent of that system.

*BACKGROUND*

 We believe this case turns on the interpretation of the proscriptions of the Fourteenth and Fifteenth Amendments. Therefore, we begin with a review of the application of those constitutional principles to voting dilution cases.[5] There are certain truisms that can be set out from the beginning. At-large voting is not *per se* unconstitutional. *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). No group, whether racially or ethnically identifiable has a right to elect representatives proportionate to its voting power in the community. *White v. Regester*, 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 149–50, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). Even consistent defeat at the polls by a racial minority does not, in and of itself, give rise to constitutional claims. *Whitcomb*, 403 U.S., at

| District | Voting Age Population | Black Voting Age Population (%) | | White Voting Age Population (%) | |
|---|---|---|---|---|---|
| 1 | 2,048 | 1,482 | (72.4) | 556 | (27.6) |
| 2 | 2,029 | 1,407 | (69.3) | 622 | (30.7) |
| 3 | 2,115 | 978 | (46.2) | 1,137 | (53.8) |
| 4 | 2,112 | 947 | (44.6) | 1,175 | (55.4) |
| 5 | 2,217 | 803 | (36.2) | 1,414 | (63.8) |

---

**5.** The Fourteenth Amendment provides in pertinent part, the following: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

The Fifteenth Amendment provides, in pertinent part, the following: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any

152–53, 91 S.Ct. 1874. In order to find a law, racially neutral on its face, unconstitutional, the plaintiff must prove that it was conceived or maintained with the intent or purpose of promoting invidious discrimination. *Id.*, at 149, 91 S.Ct. 1872. As this applies to voting dilution cases such as this, plaintiff must establish that the racially neutral at-large system was created or maintained for the purpose of preventing minority groups from effectively participating in the electoral process.[6]

It is one thing to say that the plaintiff must establish proof that the purpose for creating or maintaining a system was to unconstitutionally restrict the access of a group to the political process, it is quite another to say what evidence will suffice to establish that discriminatory purpose or intent. Cases involving literacy tests or poll taxes, or property ownership requirements are, by comparison, easy to decide. The most obvious purpose for the creation or maintenance of such systems is clearly discrimination.

In a voting dilution case in which the challenged system was created at a time when discrimination may or may not have been its purpose,[7] it is unlikely that plaintiffs could ever uncover direct proof that

such system was being maintained for the purpose of discrimination.[8] Neither the Supreme Court nor this Court, however, has denied relief when the weight of the evidence proved a plan to intentionally discriminate, even when its true purpose was cleverly cloaked in the guise of propriety. The existence of a right to redress does not turn on the degree of subtlety with which a discriminatory plan is effectuated. Circumstantial evidence, of necessity, must suffice, so long as the inference of discriminatory intent is clear.

The question then becomes, from what type of circumstantial evidence may an inference of intent be drawn, and how much of it is required? The answer to that question may be contained in the Supreme Court's recent decision in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

Appellant contends that *Bolden* represents a radical shift from and rejection of the law of this Circuit rendered prior to that decision. Appellee, as might be expected, denies that *Bolden* represents any such radical change. We believe it fair to say that *Bolden* contains certain ambiguities,[9] requiring this Court to attempt to construe it in a manner consistent with

State on account of race, color, or previous condition of servitude."

**6.** One of the conceptual reasons for allowing voting dilution cases to be maintained was well expressed by this Court in *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980). The Court said,

> An invidious at-large scheme merely achieves the same end [as gerrymandering], denial of effective participation, by submerging an interest group in a constituency large enough and polarized enough to place that group in the [electoral] minority consistently.
> *Id.* at 219.

**7.** The general election laws in many jurisdictions were originally adopted at a time when Blacks had not receive their franchise. No one disputes that such laws were not adopted to achieve an end, the exclusion of Black voting, that was the status quo. Other states' election laws, though adopted shortly after the enactment of the Fifteenth Amendment, are so old

that whatever evidence of discriminatory intent may have existed, has long since disappeared. This case falls within that category. The focus then becomes the existence of a discriminatory purpose for the *maintenance* of such a system.

**8.** We think it can be stated unequivocally that, assuming an electoral system is being maintained for the purpose of restricting minority access thereto, there will be no memorandum between the defendants, or legislative history, in which it is said, "We've got a good thing going with this system; let's keep it this way so those Blacks won't get to participate." Even those who might otherwise be inclined to create such documentation have become sufficiently sensitive to the operation of our judicial system that they would not do so. Quite simply, there will be no "smoking gun."

**9.** *See United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547 (5th Cir., 1980). "The ambiguity of the plurality opinion [in *Bolden, supra*] is alleviated by the various dissents and concurring opinions. . . ." *Uvalde* at 582.

other precedents of the Supreme Court, with the expressed and implied intent of that Court and with decisions of this Court. To that end, we will begin with a review of the Supreme Court decisions and decisions of this Court prior to the Supreme Court's ruling in *Bolden*.[10] Next, we will set out in detail the positions taken by the Justices in their various opinions in *Bolden*. At that point we will attempt to reconcile *Bolden* with prior decisions, and establish a workable rule to follow.[11] Only at that point will we consider the facts of this case and the various legal theories of each party.

### THE LAW BEFORE BOLDEN [12]

In *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the Supreme Court held, among other things, that the Equal Protection Clause of the Fourteenth Amendment was not violated, although the challenged multi-member district electoral system used in Marion County, Indiana resulted in the election of disproportionately few of that county's Black ghetto citizens. The Court concluded that the results were an inevitable political reality, because the Blacks, voting solidly as Democrats, were outvoted by the Republicans in most elections. In rejecting plaintiff's claim for relief, however, the Court noted several areas which, if factually proven, could have strengthened plaintiff's case. At one point the Court said,

> But we have deemed the validity of multi-member districts justifiable, recogniz-

ing also that they may be subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' *Fortson*, 779 U.S. at 439 [85 S.Ct. at 501], & *Burns*, 384 U.S. at 88 [86 S.Ct. at 1294]. Such a tendency, we have said, is enhanced when the district is large and elects a substantial portion of the seats in either house of a bicameral legislature, ... or if it lacks provision for at-large candidates running from particular geographical subdistricts, as in *Fortson*....

403 U.S., at 143–44, 91 S.Ct. at 1869. The Court later went into greater detail, saying, "[b]ut there is no suggestion here that Marion County's multi-member district or similar districts throughout the state, were conceived or operated as purposeful devices to further racial or economic discrimination....

We have discovered nothing in the record or in the Court's findings indicating that poor Negroes were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when the legislative candidates were chosen." *Id.* at 149, 91 S.Ct. at 1872.

Two terms after *Whitcomb*, the Supreme Court decided *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1972). In that case the Court affirmed the District

---

10. We do not attempt herein to provide an exhaustive review of all the decisions of this Court or the Supreme Court that lead up to the current state of the law. For an excellent historical survey, see Judge Tjoflat's opinion for this Court in *Nevett v. Sides, supra*, note 6. Our purpose is simply to state the law prior to *Bolden*, and to determine the impact of that ruling on this case.

11. The rule we establish is for dilution claims brought under the Fourteenth and Fifteenth Amendments. We do not reach appellees First Amendment or statutory bases for affirming the District Court's judgment. With respect to the assertion that section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides a remedy for conduct not covered by the Fifteenth Amendment, we are bound by the expression of five

Justices of the Supreme Court (*see* the opinions of Stuart, J. and Marshall, J., *dissenting*) that such is not the case. We do not express any opinion as to the application of the First Amendment or 42 U.S.C. § 1971 to this case. We believe such new courses should be charted by the Supreme Court which, as of yet, has not chosen to do so. We believe our restraint in this area is particularly appropriate given the fact that the District Court did not consider those grounds in its evaluation of the case.

12. We refer here to the law prior to the Supreme Court's decision in *Bolden*. Included in this section is an analysis of this Court's decision in *Bolden*.

Court's judgment that the multi-member districts in Dallas and Bexar County, Texas unconstitutionally diluted the voting rights of certain racial and ethnic minority groups within those counties. The Court began with the proposition enunciated in *Whitcomb*, that "[t]he plaintiff's burden is to produce evidence to support findings that the political process leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political process and to elect legislators of their choice." 412 U.S., at 766, 93 S.Ct. at 2339. The Court held that this standard had been met by plaintiffs in Dallas County, with proof that (1) the history of official racial discrimination affected the rights of Blacks to register, vote, and participate in the political process, (2) the requirements of a majority vote in primary elections coupled with the requirement that candidates run from a "place",[13] though not improper in themselves, enhanced the opportunity for racial discrimination, (3) extremely few Blacks had been slated or elected in Dallas

County since the days of Reconstruction, (4) the slating organization and its candidates who were elected were unresponsive to the needs and aspirations of the Black population because the Blacks' votes were not needed, and (5) the slating organization recently had relied on racial campaign tactics to defeat those candidates expressing concern for the needs and rights of the Black community.[14] In the case of Bexar County, the Court found the requisite exclusion from the political process with the same type, although a lesser quantity, of evidence. The Court based its decision on the finding that (1) there was a long history in Bexar County of invidious discrimination in the fields of "education, employment, economics, health, politics and others," (2) "the typical Mexican-American suffers a cultural and language barrier that makes his participation in community processes extremely difficult...," (3) Mexican-Americans were vastly underrepresented in elective positions, (4) Mexican-Americans were hindered in their efforts to register to vote until recently by a restrictive registration procedure and (5) the Bexar County

13. Running from a "place" is the same as running from a numbered post. A candidate selects the area whose seat he wishes to run for, although he need not live in that area.

14. With due regard for these standards, the District Court first referred to the history of official racial discrimination in Texas, which at times touched the right of Negroes to register and vote and to participate in the democratic processes. 343 F.Supp., at 725. It referred also to the Texas rule requiring a majority vote as a prerequisite to nomination in a primary election and to the so-called "place" rule limiting candidacy for legislative office from a multimember district to a specified "place" on the ticket, with the result being the election of representatives from the Dallas multimember district reduced to a head-to-head contest for each position. These characteristics of the Texas electoral system, neither in themselves improper nor invidious, enhanced the opportunity for racial discrimination, the District Court thought.[10] More fundamentally, it found that since Reconstruction days, there have been only two Negroes in the Dallas County delegation to the Texas House of Representatives and that these two were the only two Negroes ever

slated by the Dallas Committee for Responsible Government (DCRG), a white-dominated organization that is in effective control of Democratic Party candidate slating in Dallas County.[11] That organization, the District Court found, did not need the support of the Negro community to win elections in the county, and it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the Negro community. The court found that as recently as 1970 the DCRG was relying upon "racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community." *Id.*, at 727. Based on the evidence before it, the District Court concluded that "the black community has been effectively excluded from participation in the Democratic primary selection process," *id.*, at 726, and was therefore generally not permitted to enter into the political process in a reliable and meaningful manner. These findings and conclusions are sufficient to sustain the District Court's judgment with respect to the Dallas multimember district and, on this record, we have no reason to disturb them. 412 U.S., at 766–67, 93 S.Ct. at 2339–40.

state legislative delegation was insufficiently responsive to the interests of the Mexican-American community, when considered in the aggregate, supported plaintiff's position that they were effectively removed from the political process in Bexar County.

Following *White*, this Court decided the case of *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (*en banc*), *aff'd on other grounds, sub nom., East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975).[15] In *Zimmer*, we held a multi-member system of elections in East Carroll Parish, Louisiana violative of plaintiff's constitutional rights in that it diluted the impact of the votes of minority residents of that community. This Court, taking guidance from the decisions of the Supreme Court in *White v. Regester*, and *Whitcomb v. Chavis*, set out a list of factors that courts should consider in evaluating the constitutional permissibility of voting practices alleged to discriminate against racial minorities. We said,

> ... where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particular interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of

large districts, majority vote requirements, anti-single shot voting provisions and the lack of provisions for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in *White v. Regester, supra*, demonstrates, however, that all these factors need not be proved in order to obtain relief.

*Zimmer* at 1305.[16]

Finding that all the primary factors, except unresponsiveness,[17] were established, and that many of the "enhancing" factors were present, this Court concluded that a constitutional violation had been established.

Five years later, this Court was called on to reconsider its *Zimmer* analysis, in light of the Supreme Court's decisions in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).[18] It did so in a series of cases decided the same day: *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980); *Mobile v. Bolden*, 571 F.2d 238 (5th Cir. 1978), *rev'd.*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Blacks United for Lasting Leadership v. Shreveport*, 571 F.2d 248 (5th Cir. 1978); *Thomas-*

---

**15.** The Supreme Court expressly said that it affirmed the judgment "without approval of the constitutional views expressed by the Court of Appeals." 424 U.S., at 638, 96 S.Ct., at 1084.

**16.** In *Zimmer*, the proof of these criteria was an end unto itself. This Court did not make the next inquiry, as is now required, as to the extent to which the proof of those factors would allow an inference of intentional discrimination to be drawn.

**17.** As will be discussed, *infra, Zimmer* was constitutionally infirm to the extent relief was granted without proof of unresponsiveness. We believe this is one of the significant reasons that *Zimmer* was criticized so strongly in *Bolden*.

**18.** These were not voting dilution cases. They simply reaffirmed "the basic equal protection principle that the invidious quality of law [neutral on its face] claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." 426 U.S., at 240, 96 S.Ct., at 2048. The Court indicated its intent to have the rule broadly applied to cases such as this, by referring approvingly to *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), a congressional apportionment case, in which proof of discriminatory purpose was required.

*ville Branch of the NAACP v. Thomas County*, 571 F.2d 257 (5th Cir. 1978).[19]

In the first case in that series, *Nevett v. Sides, supra*, Judge Tjoflat, writing for this Court, extensively reviewed the status of the law with regard to claims that certain voting practices violate the Fourteenth and Fifteenth Amendment rights of racial minorities. On the basis of *Washington v. Davis*, and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the Court concluded that such a claim could not to be established without proof that the allegedly discriminatory system was conceived or maintained for the purpose of restricting the access of minorities to the political process. 571 F.2d at 219–21.[20]

As was the case in decisions discussed previously, the question became what type and how much evidence is required to establish proof of intent. Particularly, the Court was attempting to set forth the evidence that would allow an inference to be drawn that the electoral system was being maintained, rather than implemented, for a discriminatory purpose.[21] After detailed analysis the Court concluded that the presence of the factors set out in *Zimmer could* allow the inference of purposeful discrimination to be drawn. The Court reasoned that if the electoral system was not being maintained for the purpose of achieving the constitutionally proscribed end, i.e., official perpetuation of discriminatory distribution of political and economic power, it was highly unlikely that the criteria set out in

*Zimmer* could be established. The Court was quick to indicate on the other hand, that the finding of purpose or intent should not be a mathematical process by which the party proving or refuting the greatest number of criteria is declared the winner. We said,

> [t]hat the finder of fact determines the plaintiff has prevailed under one or even several of the *Zimmer* criteria may not establish the existence of intentional discrimination. *See, e. g., McGill v. Gadsden County Commission*, 535 F.2d 277 (5th Cir. 1976). The evidence under the other criteria may weigh so heavily in favor of the defendant that the evidence as a whole will not bear an inference of invidious discrimination. Of course, the plaintiff need not prevail under all of the criteria, *Zimmer*, 485 F.2d at 1305, nor is he limited to them. The task before the fact finder is to determine, under all the relevant facts, in whose favor the "aggregate" of the evidence preponderates. This determination is peculiarly dependent upon the facts of each case. It comprehends "a blend of history and an intensely local appraisal of the design and impact of the [at-large] district in the light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S., at 769–70, 93 S.Ct., at 2341. It is the obligation, therefore, of the finder of fact carefully to examine and weigh the competing factors to determine whether the coincidence of those probative of intentional discrimination is sufficient.

---

**19.** We discuss herein only the first two of the four cases. The first case, *Nevett v. Sides*, is important to this analysis because this Court used that case to set forth the principles of law to be applied in all such cases. The second decision, *Mobile v. Bolden*, is significant here because it was the Supreme Court's rejection of our analysis in that case that gives rise to appellant's contention that this Court has been employing an erroneous legal standard.

**20.** So that there can be no doubt that the Court thought purpose or intent to be essential elements of a Fourteenth or Fifteenth Amendment claim, we quote some of the language in that opinion. With respect to a claim founded on the Fourteenth Amendment, the Court said,

"... we hold that a showing of racially motivated discrimination is a necessary element in an equal protection voting dilution claim such as the one presented in this case." 571 F.2d at 219. Similarly, the Court said, "A showing of improper motivation or purpose is necessary to establish a valid cause of action under the Fifteenth amendment." *Id.* at 221.

**21.** There was no contention that the system was created for discriminatory purposes because, at the time of its creation, Blacks had been effectively disenfranchised by an amendment to the Alabama Constitution.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564.

571 F.2d at 224–25.

The Court went to great lengths to explain how each of the *Zimmer* criteria, if established, could be evidence allowing an inference of intent. Of particular significance to our resolution of this case is our discussion of the un-responsiveness factor. The Court said

> Consider a plan neutral in its enactment that is used as a vehicle for intentionally ignoring black interests. The existence of such discrimination presupposes racially polarized voting in the electorate. Polarized or bloc voting, although in itself constitutionally unobjectionable, allows representatives to ignore minority interests without fear of reprisal at the polls. When bloc voting has been demonstrated, a showing under *Zimmer* that the governing body is unresponsive to minority needs is strongly corroborative of an electorate's bias. The likelihood of intentional exploitation is "enhanced" by the existence of systemic devices such as a majority vote requirement, an anti-single shot provision, and the lack of a requirement that representatives reside in subdistricts.

571 F.2d at 223.

Having established the standard by which to evaluate evidence of intent, the Court considered the facts of the case then at bar. Finding the factual determinations of the trial court, that plaintiffs had failed to establish evidence of the *Zimmer* criteria, not to be clearly erroneous, this Court affirmed the District Court's judgment for defendants.

*Mobile v. Bolden*, 571 F.2d 238 (5th Cir. 1978), *rev'd*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) was the second of the four voting dilution cases decided by this Court. In that case, this Court affirmed the District Court's judgment that plaintiff-appellee's Fourteenth and Fifteenth Amendment rights had been violated, and reinstated the District Court's order requiring that city commissioners be elected from single-member districts in the future.

Rather than repeat the lengthy historical analysis by which the Court in *Nevett, supra*, concluded that proof of intentional or purposeful maintenance of a discriminatory system was a requisite to proving a dilution case, the Court simply incorporated by reference that portion of the *Nevett* decision.[22] At only one place in the decision did the Court explicitly refer to the intent requirement. The Court said,

> Under our holding of today in *Nevett* II, these findings also compel the inference that the system has been maintained with the purpose of diluting the black vote, thus supplying the element of intent necessary to establish a violation of the fourteenth amendment, *Village of Arlington Heights*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 597 (1976), and the fifteenth amendment, *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

571 F.2d at 245. Despite the brevity of this comment, a careful reading of the decision confirms our conclusion that the Court was following the purpose or intent standard set out in *Washington v. Davis*, and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*

In attempting to evaluate the existence of discriminatory intent in the maintenance of a racially neutral electoral system, the

---

22. "We also incorporate the portions of our opinion of today in *Nevett II* [*Nevett v. Sides*] that explicate the legal principles applicable to voting dilution cases." 571 F.2d at 241. We believe the Court's decision to incorporate by reference the legal standard, with respect to the necessity of establishing proof of purpose or intent, may have given rise to the erroneous conclusion that this Court did not recognize the need for such proof in that case. A careful reading of our opinion in *Bolden*, however, leads inextricably to the conclusion that proof of discriminatory intent was required.

Court was required to consider circumstantial evidence from which an inference of intent could be drawn. Accordingly, the Court applied the *Zimmer* criteria and, holding the District Court's finding of intentional maintenance of a discriminatory system not to be clearly erroneous,[23] entered judgment for the plaintiffs. The remedy afforded, however, was considerably different than in the traditional dilution case. Mobile had operated under a three-person commission form of government. The commission was responsible for all executive and administrative functions of the city. The three commissioners elected one of their members to serve as Mayor. The District Court concluded that the discriminatory system could not be remedied, as in the normal case, by dividing the city into districts along preexisting ward or precinct lines. Accordingly, the District Court ordered the commission form of government abolished and replaced it with a mayor-commission system under which the executive and legislative functions were separated, the former being allocated to the mayor, the latter to the council. Additionally, the District Court changed the commission size from three members to a council with nine members, each member being elected from a single-member district.

*BOLDEN*

We come now to the Supreme Court's recent decision, *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Depending on which party to this litigation one listens to, this decision is either revolutionary, definitive, and absolute or evolutionary, ambiguous, and flexible in its impact on the state of the law. As will be discussed, we do not agree with either of those positions. We do agree, however, that it is a complex ruling; the Court's opinion commanding only a plurality, with a total of six separate opinions being published. In order to shed the most light on the implications of the decision, we will begin by reviewing the positions taken by the Justices in their separate opinions.

(a) *The Plurality*—Justice Stewart, writing for the plurality,[24] begins with an analysis of this Court's opinions with respect to the Fifteenth Amendment. He details the case law development of the Fifteenth Amendment and concludes, as did this Court, that "action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose." 100 S.Ct. at 1497. The plurality then concludes that only purposeful conduct which *directly* interferes with the rights of Blacks to register or vote is proscribed by the Fifteenth Amendment.[25] The Court said, "That Amendment prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude.' Having found that Negroes in Mobile, 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of that Amendment in the present case." 100 S.Ct., at 1499.

The plurality next focused its attention on this Court's conclusion that Mobile's electoral system violated plaintiff-appellee's Fourteenth Amendment equal protection rights. The opinion begins with the proposition taken from *Whitcomb v. Chavis*, and

23. In reaching its conclusion, that the electoral system was maintained for discriminatory purposes, the District Court found all of the *Zimmer* criteria present except that going to the weight of the state policy behind at-large elections. With respect to that factor, the District Court concluded that it was neutral.

24. Justice Stewart was joined in the opinion by Chief Justice Burger, Justice Powell, and Justice Rehnquist.

25. This restrictive view of the role of the Fifteenth Amendment in cases such as this did not command a majority of the Court. In fact, five Justices explicitly stated that, with the proper proof, the Fifteenth Amendment would support a voting dilution claim.

*White v. Regester*, and adhered to by this Court in its opinion in *Bolden*, 571 F.2d 238 (5th Cir. 1980), that to prove a constitutional violation in a dilution case "it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. (citations omitted). A plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful device to further racial discrimination.'" 100 S.Ct., at 1499.

Looking at the record in the case at bar the Court held, "... it is clear that the evidence in the present case fell far short of showing that the appellants 'conceived or operated [a] purposeful device to further racial discrimination.' (citation omitted)." 100 S.Ct., at 1502. The Court compared *White v. Regester*, the "only [] case [] in which the Court sustained a claim that multimember legislative districts unconstitutionally diluted the voting strength of a discrete group." 100 S.Ct. at 1500, with the facts of the case before it. Though recognizing that courts attempting to evaluate the constitutionality of racially neutral legislation "... must look to other evidence to support a finding of discriminatory purpose." 100 S.Ct. at 1501, the Court held that, "[t]he so-called *Zimmer* criteria upon which the District Court and the Court of Appeals relied were most assuredly insufficient to prove an unconstitutionally discriminatory purpose in the present case." 100 S.Ct., at 1503. The plurality was of the opinion that, while "the presence of the indicia relied on in *Zimmer* may afford some evidence of a discriminatory purpose," 100 S.Ct., at 1503, neither the quality nor the quantity of the evidence presented supported a finding of purposeful conduct.

(b) *Justice Blackmun's concurrence*

In the first of two concurring opinions, Justice Blackmun states that he is joining in the result reached by the plurality "because I believe the relief afforded appellees by the District Court was not commensurate with the sound exercise of judicial discretion." 100 S.Ct., at 1507. Justice Blackmun was unable to accept the District Court's decision to force Mobile to abandon its seventy year old commission form of government for a mayor-council system, without first attempting to fashion a remedy that would be compatible with the existing system. Justice Blackmun said, "... I do not believe that, in order to remedy the unconstitutional vote dilution [] found, it was necessary to convert Mobile's city government to a mayor-council system. In my view, the District Court at least should have maintained some of the basic elements of the commission system Mobile long ago had selected—joint exercise of legislative and executive power, and citywide representation." 100 S.Ct., at 1508.

Despite his concurrence in the result, Justice Blackmun was clear in his view that he agreed with Justice White's dissent as to the substantive questions of constitutional law presented. At the outset of his opinion, Justice Blackmun said, "Assuming that proof of intent is a prerequisite to appellees' prevailing on their constitutional claim of vote dilution, I am inclined to agree with Mr. Justice White that, in this case, 'the findings of the District Court amply support an inference of purposeful discrimination,' *post*, at 1518." 100 S.Ct., at 1507. It is particularly significant that Justice Blackmun agreed with that portion of Justice White's dissent that said the District Court was correct as to its determination that both the Fourteenth and Fifteenth Amendments had been violated.

(c) *Justice Stevens concurrence*

Though Justice Stevens concurred in the result, he would have the Court apply a test which appears diametrically opposite that employed by the plurality. He said,

In my view, the proper standard is suggested by three characteristics of the ger-

rymander condemned in *Gomillion* :[26] (1) the 28-sided configuration was, in the Court's word, "uncouth," that is to say, it was manifestly not the product of a routine or a traditional political decision; (2) it had significant adverse impact on a minority group; and (3) it was· unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority. ·*These characteristics suggest that a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decision maker.* (emphasis added)

100 S.Ct., at 1512. Justice Stevens then goes on to say that, not only does he reject the purpose or intent test of the plurality, but also that "... I am persuaded that a political decision that affects group voting rights may be valid even if it can be proved that irrational or invidious factors have played some part in its enactment or retention." *Id.*

Though it is clear that Justice Stevens rejects the plurality opinion in all respects other than the result achieved, his opinion leaves this and other courts in a somewhat precarious position as to the rule to be applied in future cases. For example, it is unclear what standard Justice Stevens would apply were he to attempt to find the purposeful or intentional conduct that five other Justices would require. In that regard, he rejects the *Zimmer* criteria, not because they are inappropriate when at-

tempting to draw an inference of intent, but rather because he is not concerned with such proof of subjective intent. It is entirely possible, and in fact likely, that he would employ the *Zimmer* criteria were he required to evaluate the existence of discriminatory intent.[27]

### (d) *Justice White's dissent*

Justice White would reach a result different than that reached by the plurality, although apparently agreeing that purposeful discrimination is a necessary element of a Fourteenth or Fifteenth Amendment dilution claim. His position is quite simply that *Bolden* is controlled by *White v. Regester*, and that the plurality incorrectly applied the rule established in that case, that courts should consider the totality of historical, cultural, and socio-economic factors in evaluating the existence of a purposefully discriminatory electoral system. He begins by demonstrating how the factors considered in *White* were similar, if not identical, to those which the District Court and Court of Appeals applied in finding for the plaintiffs in *Bolden*. He then points out that the District Court and Court of Appeals, addressing "the effect of *Washington v. Davis*, (citations omitted), on the *White v. Regester* standards.... concluded that the requirement that a facially neutral statute involved purposeful discrimination before a violation of the Equal Protection Clause can be established was not inconsistent with *White v. Regester* in light of the recognition in *Washington v. Davis* that the dis-

---

**26.** *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

**27.** Justice Stevens said,

"... a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker. (citation omitted). In this case, if the commission form of government in Mobile were extraordinary, or if it were no more than a vestige of history, with no greater justification than the grotesque figure in *Gomillion*, it would surely violate the Constitution. That conclusion would follow simply from its adverse impact on black voters plus

the absence of any legitimate justification for the system, without reference to the subjective intent of the political body that has refused to alter it."

446 U.S., at 86, 100 S.Ct., at 1512. Justice Stevens looks only to the effects of an electoral system. The *Zimmer* approach looks at those same effects, but only to the extent that they allow an inference of intent. It is reasonable to assume, therefore, that, were he required to draw an inference of intent, Justice Stevens would employ the same factors that he thinks are relevant independent of the intent inquiry.

criminatory purpose may often be inferred from the totality of the relevant facts...." 100 S.Ct., at 1516. Justice White thought this approach to be consistent with that of the Court in *Washington v. Davis*, in which it said, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts including the fact, if it is true, that the law bears more heavily on one race than another." 426 U.S., at 242, 96 S.Ct., at 2048–49. Ultimately, Justice White concludes that the plurality opinion is simply inconsistent with those of the Court in *White, Whitcomb, Village of Arlington Heights,* and *Washington,* although it expresses an intent to affirm the positions taken in and be consistent with those decisions.

### (e) *Justice Brennan's dissent*

Justice Brennan's position is concise and unequivocal. He agrees with Justice Marshall "that proof of discriminatory impact is sufficient in these cases." 100 S.Ct., at 1520. He also states that "... even accepting the plurality's premise that discriminatory purpose must be shown, I agree with Mr. Justice Marshall and Mr. Justice White that appellees have clearly met that burden." *Id.*

### (f) *Justice Marshall's dissent*

Justice Marshall's analysis was substantively similar to the bifurcated position of Justice Brennan, although he went into far greater depth to explain the jurisprudential underpinning of his opinion. We do not here review Justice Marshall's exposition as to why proof of intent is unnecessary in cases such as this. This is not because his opinion is lacking in philosophical appeal, but rather because, given the opinions of at least six members of the Court, it is quite clearly not the law by which the present case must be governed. With respect to the question of the proof necessary to establish the requisite intent to discriminate, Justice Marshall would impose a substantially different burden of proof on the plaintiffs than would the plurality. Justice Marshall rejects the plurality's position that the plaintiff must prove that "the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Rather, Justice Marshall "would apply the common-law foreseeability presumption" 100 S.Ct., at 1538, to cases such as this. Applying his standard, "[t]he defendants would carry their burden of proof only if they showed that they considered submergence of the Negro vote a detriment, not a benefit, of the multimember systems, that they accorded minority citizens the same respect given to whites, and that they nevertheless decided to maintain the systems for legitimate reasons." *Id.*

## RECONCILING BOLDEN

■ There are certain principles that can be stated definitively after *Bolden.* A plaintiff bringing a voting dilution case attacking an electoral system that is racially neutral on its face, may challenge such system on the grounds that it violates either the Fourteenth or Fifteenth Amendment. Though the plurality would limit the scope of the Fifteenth Amendment to those situations in which there was official action directly impinging the rights of Blacks to register or vote, that position did not command a majority. Three dissenting Justices specifically said the parameters of the Fifteenth Amendment encompasses voting dilution cases in which it is asserted that the system purposefully limits the access of Blacks to the political process. In his concurrence, Justice Blackmun agrees with the position taken by Justice White in his dissent, as to the substantive questions presented, and thereby becomes the fourth member of the Court to approve of an expansive reading of the Fifteenth Amendment. In his concurrence, Justice Stevens explicitly states, "... I disagree with Mr. Justice Stewart's conclusion for the plurali-

ty that the Fifteenth Amendment applies only to practices that directly affect access to the ballot and hence is totally inapplicable to the case at bar." [28] 100 S.Ct., at 1509 n. 3. He also said, ". . . I am satisfied that such a structure [at-large systems] may be challenged under the Fifteenth Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment. . . ." 100 S.Ct., at 1509. We conclude, therefore, that five Justices believe the Fifteenth Amendment creates a right of action in voting dilution cases.

■ An even less disputable principle, after *Bolden*, is that a plaintiff challenging an at-large voting system must prove that the system was created or maintained for the purpose of limiting the access of or excluding Blacks from effective participation in that system.

The question we return to is what type and how much evidence is required to establish proof of a discriminatory purpose. It seems to us that there are three possibilities.

■ The first possibility is that *Bolden* requires direct evidence of intent. We think this is incorrect. Not only does the plurality opinion say that the circumstantial evidence in *Zimmer* "may afford some evidence of a discriminatory purpose" 100 S.Ct., at 1503, common sense tells us that in a case such as this, in which it can not be asserted that the system was created for discriminatory purposes, it is likely that no plaintiff could ever find direct evidence that the system was maintained for discrim-

inatory purposes. Clearly, the right to relief cannot depend on whether or not public officials have created inculpatory documents.[29] We must reject this first possibility.

The second possibility is that, while circumstantial evidence may suffice, the type of circumstantial evidence called for in *Zimmer* is inadequate to prove discriminatory purpose. We think this is the elusive area post-*Bolden*. Though four Justices were satisfied with the *Zimmer* criteria,[30] five Justices clearly rejected the *exclusive* use of those criteria as the means of inferring purpose or intent.[31] We conclude that they rejected the use of the *Zimmer* criteria to the extent that this Court, in *Bolden, presumed* the existence of a discriminatory purpose from the proof of some of those factors. We believe the Court rejected the use of such a quantitative weighing approach, requiring instead an independent inquiry into intent. Additionally, we think the Supreme Court was directing all courts making the inquiry to apply the *Zimmer* criteria only to the extent that they are relevant to the factual context at hand and, to the extent they are not so relevant, to employ other criteria. Finally, it appears that the Supreme Court has somewhat increased the burden of proof on plaintiffs in such cases. In *Zimmer*, this Court granted relief despite the factual conclusion that the police juries and school board in question were not unresponsive to the needs of the Black community. The Supreme Court implicitly concluded in *Bolden*, as we explicitly do today, that absent such proof of unresponsiveness a *prima facie* case can not be

---

**28.** In that same footnote, Justice Stevens points out that it is ". . . difficult to understand why, given this position [that the Fifteenth Amendment is inapplicable to cases such as the one at-bar], he [Justice Stewart] reaches out to decide that discriminatory purpose must be demonstrated in a proper Fifteenth Amendment case." 100 S.Ct., at 1509, n. 3.

**29.** *See* note 8, *supra* and accompanying text.

**30.** Justice Blackmun agreed with the three dissenting Justices that the evidence adduced at

trial was sufficient to prove discriminatory intent.

**31.** The plurality was joined in this position by Justice Stevens. It is essential to understand, however, that he rejects the use of the *Zimmer* criteria to draw an inference of intent, not because he believes such proof cannot establish discriminatory intent, but rather because he thinks the question of intent is irrelevant to the disposition of cases such as this.

established. *Zimmer* has been rejected to the extent it holds otherwise. Thus, we make one exception to our earlier statement that proof of the *Zimmer* criteria is required only to the extent that they are relevant to the facts of a particular case. We believe, however, that this exception is well grounded in the conceptual framework that recognizes the Constitutional rights here involved. As has been stated before, the Fourteenth and Fifteenth Amendments protect the right to effective participation in the electoral process. Effective participation does not mean the right to have members of one's race, sex, or group elected to political office. What it does mean is that the system of government that serves the interests of the people must serve the interests of all the people; at least to the extent that one group's interests are not invidiously discriminated against. Therefore, a racially definable group may challenge an electoral system on dilution grounds only if it can be shown that the system invidiously operates to the detriment of their interests. Unresponsiveness is a necessary element to plaintiff's maintenance of an action such as this. Proof of unresponsiveness, alone, does not give rise to an inference that the system is maintained for discriminatory purposes. That conclusion must be reached only in light of the totality of the circumstances presented.

Appellant contends that, in light of *Bolden*, the use of the *Zimmer* criteria to draw an inference of intent is erroneous. Such a broad absolute reading of *Bolden* seems unwarranted and incorrect.[32] In *Bolden*, the Supreme Court specifically refers with ap-

proval to its decisions in *White v. Regester* and *Whitcomb v. Chavis*. The Court points out that, in *White*

> the Court relied upon evidence in the record that included a long history of official discrimination against minorities as well as indifference to their needs and interests on the part of white elected officials. The Court also found in each county additional factors that restricted the access of minority groups to the political process. In one county, Negroes effectively were excluded from the process of slating candidates for the Democratic Party, while the plaintiffs in the other county were Mexican-Americans who "suffer[ed] a cultural and language barrier" that made "participation in community processes extremely difficult, particularly . . . with respect to the political life" of the county. 412 U.S. at 768, 93 S.Ct. at 2340–41 (footnote omitted).

100 S.Ct., at 1501. Moreover, it is clear that the *Zimmer* criteria were gleaned from the Supreme Court's guidance in *White* and *Whitcomb*.[33] Finally, the plurality itself recognized that "the indicia relied on in *Zimmer* may afford some evidence of a discriminatory purpose. . . ." In our opinion, therefore, the use of the *Zimmer* criteria is sound to the extent that the inquiry focuses on the primary question of *discriminatory purpose*.

The third possible explanation for the Supreme Court's decision in *Bolden* is simply that the evidence adduced was insufficient to allow an inference of discriminatory purpose. We believe this was the most significant factor behind the Court's rul-

---

32. *See United States v. Uvalde Consolidated Independent School District, supra,* note 9, in which this Court said, "We are convinced that the fundamental reasoning of our decision in *Bolden,* and its companion, *Nevett v. Sides,* 571 F.2d 209 (5th Cir. 1978), survives the Supreme Court's decision [in *Bolden* ] intact." *Uvalde* at 582.

33. In his dissenting opinion in *Bolden,* Justice White points out that

". . . *Zimmer* articulated the very factors deemed relevant by *White v. Regester* and *Whitcomb v. Chavis*—a lack of minority access to the candidate selection process, unresponsiveness of elected officials to minority interests, a history of discrimination, majority vote requirements, provisions that candidates run for positions by place or number, the lack of any provision for at-large candidates to run from particular geographical subdistricts.

100 S.Ct., at 1518.

ing.[34] After indicating that the factors enunciated in *Zimmer* could be indicative though not conclusive of discriminatory purpose, the Court said, "[t]he so-called *Zimmer* criteria upon which the District Court and the Court of Appeals relied were most assuredly insufficient to prove an unconstitutionally discriminatory purpose *in the present case.*" (emphasis added) 100 S.Ct., at 1503. The fact that such a weighing of the evidence was difficult and extremely close is reflected by the division of the Court.

## THE RULE ESTABLISHED

A cause of action under the Fourteenth or Fifteenth Amendment asserting unconstitutional vote dilution through the maintenance of an at-large electoral system is legally cognizable only if the allegedly injured group establishes that such system was created or maintained for *discriminatory purposes.* A discriminatory purpose may be inferred from the totality of circumstantial evidence. An essential element of a *prima facie* case is proof of unresponsiveness by the public body in question to the group claiming injury. Proof of unresponsiveness, alone, does not establish a *prima facie* case sufficient to shift the burden of proof to the party defending the constitutionality of the system; responsiveness is a determinative factor only in its absence. The *Zimmer* criteria may be indicative but not dispositive on the question of intent. Those factors are relevant only to the extent that they allow the trial court to draw an inference of intent. The *Zimmer* criteria are not the exclusive indicia of discriminatory purpose and, to the extent they are not factually relevant in a given case, they may be replaced or supplemented by more meaningful factors.[35] Even if all of the *Zimmer* and other factors

are established, an inference of discriminatory purpose is not *necessarily* to be drawn. The trial court must consider the totality of the circumstances and ultimately rule on the precise issue of discriminatory purpose. Finally, given the reality that each case represents an extremely unique factual context for decision, this Court will give great deference to the judgment of the trial court, which is in a far better position to evaluate the local political, social, and economic realities than is this Court.

## THE PRESENT CASE

The complaint in this action was originally filed in April, 1976. District Judge Alaimo's final order, including findings of fact and conclusions of law, was entered over two and one-half years later. The length of the pendency of the case was largely attributable to the extensive discovery conducted by both parties. At the conclusion of the non-jury trial, Judge Alaimo held for the plaintiff class, concluding that Burke County's system of electing county commissioners on an at-large basis had been maintained for the purpose of limiting the access of that county's Black residents to the electoral process.

Much ado has been made by appellants in this action about the fact that the District Court's order preceded the Supreme Court's decision in *Mobile v. Bolden.* Though this could make a difference in some cases, we do not find such timing controlling here. As we indicated earlier, the "new rule" established in *Bolden* appears to be an expansion of the principles earlier established in *Washington v. Davis* and *Village of Arlington Heights v. Metropolitan Housing Development Corp.* A court that correctly anticipated how the intent requirement in

---

**34.** In *Uvalde, supra* note 9, Judge Rubin points out that "... the plurality's rejection of the fifteenth amendment and section 2 claims in *Bolden* may rest entirely upon the conclusion that no discriminatory motivation was shown." *Uvalde* at 582.

**35.** As we have indicated, the unresponsiveness criteria may not be replaced. Proof of unresponsiveness is an essential element to the maintenance of a claim such as this. It should be supplemented, of course, with such other criteria as may be relevant to the analysis of a given case.

those cases would be applied to voting dilution cases, as in *Bolden*, could correctly interpret and apply the law, without the benefit of the Supreme Court's recent opinion. This is precisely the type of foresight demonstrated by Judge Alaimo in the present case. At the outset of his order, Judge Alaimo refers to this Court's treatment of *Washington v. Davis* and *Village of Arlington Heights v. Metropolitan Housing Development Corp.* in *Nevett v. Sides*, 571 F.2d 209, 221 (5th Cir. 1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980), and concludes that ' . . . [a] demonstration of intention is necessary under both fourteenth and fifteenth amendments,' as a requisite to a finding of unconstitutional vote dilution. *Herman Lodge v. Buxton*, No. 78–3241, Findings of Fact and Conclusions of Law at 4 (S.D.Ga., Oct. 26, 1978) (hereinafter *Order*). It is clear, therefore, that Judge Alaimo employed the constitutionally required standard in his evaluation of the present case. We cannot affirm his judgment, however, unless and until we conclude that his analysis satisfies the rule we have established today.

To begin with, we note that the District Court's order was not defective for exclusive and unwarranted reliance on the *Zimmer* criteria. Though the court did consider those criteria it also evaluated the case in light of "other factors" set out by this Court in *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139 (5th Cir.) (*en banc*), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). In its order the District Court said, "It must be remembered that the Court is not limited in its determination to the *Zimmer* factors, rather the Court may consider the *Zimmer* factors, 'or similar ones.' *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d at 143. One 'similar factor' considered in *Kirksey* which did not seem to be an explicit pri-

mary factor in the *Zimmer* formula, is a depressed socio-economic status, 'which makes participation in community processes difficult.' *Id.*[36] This is an important factor and must be considered here." *Order* at 6. On the basis of these statements, as well as the District Court's detailed analysis of the *Kirksey* factors, we conclude that the District Court did not treat the *Zimmer* criteria as absolute, but rather considered them only to the extent they were relevant to the question of discriminatory intent.

The next step in our analysis is to determine whether the District Court properly made a finding of unresponsiveness. As we indicated earlier, failure to find unresponsiveness precludes the maintenance of a voting dilution case. For the reasons set out below, we conclude that the District Court's finding of unresponsiveness was quite correct in the present case.

After considering exhaustive evidence on the subject, the Court found that the county commissioners demonstrated their unresponsiveness to the particularized needs of the Black community by: (1) allowing some Blacks to continue to be educated in largely segregated and clearly inferior schools; (2) failing to hire more than a token number of Blacks for county jobs, and paying those Blacks hired lower salaries than their White counterparts; (3) appointing extremely few Blacks to the numerous boards and committees that oversee the execution of the county government, particularly those groups, such as the committee overseeing the Department of Family and Childrens Services, whose function is to monitor agencies of the county government that work primarily with Blacks; (4) failing to appoint any Blacks to the judge selection committee, with respect to the appointment of a Judge for the Burke County Small Claims Court, despite the fact that most of the defendants in that court are Black; (5) making road

---

**36.** We think the District Court's consideration of this factor, in addition to those established in *Zimmer*, is particularly significant given how important the presence of a depressed socio-economic condition was to the Supreme

Court's determination in *White v. Regester* that the at-large electoral system in Bexar County, Texas violated plaintiffs Fourteenth Amendment rights.

paving decisions in a manner so as to ignore the legitimate interests of the county's Black residents; [37] (6) forcing Black residents to take legal action to protect their rights to integrated schools and grand juries, and to register and vote without interference; [38] and (7) participating in the formation of, and in fact contributing public funds to the operation of, a private school established to circumvent the requirements of integration. We hold, not only was the District Court's finding of unresponsiveness not clearly erroneous, but that the county commissioners, acting in their official capacity, have demonstrated such insensitivity to the legitimate rights of the county's Black residents that it can only be explained as a conscious and willful effort on their part to maintain the invidious vestiges of discrimination. To find otherwise would be to fly in the face of overwhelming and shocking evidence.

A second factor going to the question of discriminatory intent is the extent to which historical discrimination impacts on a minority group's *present* opportunity for effective participation in the electoral process.[39] On the basis of substantial evidence, the District Court concluded that previous acts of official discrimination had a significant negative impact on the opportunity of Blacks in Burke County to exercise their right to so participate. We agree.

The District Court began by assessing the present impact on voter registration of the prior absence of Black suffrage. The Court said that until 1965, when the Voting Rights Act was adopted, Black suffrage was "virtually non-existent." At present, Black voter registration is approximately

---

37. As a typical example of the lack of concern that White county commissioners have for the interest of Burke's Black residents, the District Court pointed to the facts that

(1) The Mamie Jo Rhodes Subdivision, inhabited by Blacks is unpaved. It is directly across from a subdivision inhabited by Whites. The latter has paved roads. (2) Millers Pond Road is paved up to the pond, used by Whites; but from that point the road is unpaved, although that portion is inhabited by Blacks. (3) Paving on Hatchett Road ends at the residence of a White; yet Blacks live on the remainder of the unpaved road. (4) The streets of Alexander are paved in the section of town inhabited by Whites; but the roads in the black section are not paved. And (5) county road road 284 is paved to the point where the last white lives, but beyond, where the road is inhabited by Blacks, the road is unpaved. It is of interest to note that the road to the dog trial field is paved even though trials are held but once a year. By contrast, there is still an unpaved road to a school. Although the last unpaved road to a white school was paved in 1930, it seems as if the road to the Palmer Elementary School, formerly an all-black school, and still predominately black, remains unpaved.

*Order* at 13–14. Our review of the evidence in this case leads us to the conclusion that these patent examples of discriminatory treatment by Burke's county commission typify the treatment received by Blacks in Burke County in every interaction they have with the White controlled bureaucracy.

38. Of particular significance, given the plurality position in *Bolden* that a Fifteenth Amendment violation occurs only when there is proof that the right to register and vote was *directly* impinged, is the District Court's finding that such overt conduct was taking place even at the time the present lawsuit was filed. The court said

The county did, indeed, establish additional registration sites. But only after a pre-trial conference before and "friendly persuasion" by this Court. The defendants' tepidity was further demonstrated by the fact that a period of four months was required to get the registration cards to the new sites; and that the new sites were operative only a short while before the registration period ended. Admittedly, the County Commissioners recently approved a transportation system that should help solve access problems for some; but only after being prodded by the prosecution of this lawsuit. The Commissioners' sluggishness in this respect is another example of their unresponsiveness to the black members of the community.

*Order* at 14–15.

39. The focus of the District Court properly was on the *present* effects of discrimination. As the Supreme Court said in *Bolden*, "... past discrimination cannot, in the manner of original sin, condemn government action that is not in itself unlawful." 100 S.Ct., at 1503.

38% of those eligible.[40] On that basis, the Court thought it reasonable to infer that "[t]he marked increase in the registration of Blacks following the enactment of the 1965 Voting Rights Act clearly indicates that past discrimination has had an adverse effect on Black voter registration which lingers to this date." *Order* at 7.

█ The Court considered next the fact of past and present bloc voting as it impacts the present ability of Blacks to participate in the electoral system. The evidence of such bloc voting was clear and overwhelming.[41] Of particular significance was the fact that in the one city election in which city councilmen were elected from single-member districts,[42] a Black was elected.

Inadequate and unequal educational opportunities, both in the past and present, as the result of official discriminatory acts, was another consideration important to the court. The evidence was clear that the relative percentage of Blacks who had attended high school, finished high school, or attended college was substantially less than the White residents of Burke County. On the basis of that evidence, as well as expert testimony, the Court concluded that "... one reason Blacks, as a group, have been ineffective in the political process, is the fact that they have completed less formal education." *Order* at 9.

Further evidence of the effective preclusion from participation in the electoral process, based on official conduct, was found in the past and present operation of the county's Democratic primary system and in the Georgia law making it more difficult for

Blacks to serve as chief registrar in a county. The history of the Democratic Party Primary ranges from the "white primary", struck down in 1946, *Chapman v. King*, 154 F.2d 460 (5th Cir.), *cert. denied*, 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025 (1946), to the present twenty-four member Burke County Democratic Executive Committee, of whom only one is Black. This present lack of participation was found to be the direct result of historical discrimination. Equally significant evidence of official present discrimination was found in Ga. Code Ann. § 34-605, which states in pertinent part, "[n]o person shall be eligible to serve as chief registrar unless such person owns interest in real property...." Given the testimony that significantly fewer Blacks than Whites are freeholders, the Court concluded that the statute operated to restrict Black participation in the electoral process.

█ On the basis of the evidence set out herein, as well as that of official discrimination in employment, paving, etc., as discussed earlier, the District Court concluded that the effect of historical discrimination was to restrict the opportunity of Blacks to participate in the electoral process in the present. That finding is not clearly erroneous, and, as with the unresponsiveness factor, we completely agree.

The third factor considered by the District Court was depressed socio-economic participation in the electoral process. The evidence on this point was both clear and disconcerting. Blacks suffer at the poverty level to a far greater proportionate degree

---

**40.** There was some conflict in the evidence as to the percentage of eligible Blacks who were registered to vote. Defendants asserted that the correct figure was 44%, while plaintiffs asserted that it was 38%. The District Court resolved the issue for plaintiffs, but indicated that either figure supported the conclusion it reached.

**41.** Of course, bloc voting is not illegal. Nonetheless, the Supreme Court and this Court have repeatedly recognized that voting along racial lines enhances the likelihood that those seeking to manipulate the electoral system for discrimi-

natory purposes will succeed. It is for that reason that the inquiry into voting patterns is relevant. Like unresponsiveness, it is a factor of greater significance in its absence. A plaintiff would be hard pressed to prove that a system was being maintained for invidious purposes, without proof of bloc voting.

**42.** The election was from single-members districts, rather than at-large, pursuant to a court order. *See Sullivan v. DeLoach*, Civ.No. 176-238 (S.D.Ga., Sept. 11, 1977).

than the White residents of Burke County. Over one-half of the Black residents have incomes equaling three-fourths, or less, of a poverty level income. Seventy-three percent of all Black households lacked some, or all, plumbing facilities, as opposed to sixteen percent of the White households. Blacks in Burke County tend to be employed to a far greater degree in menial positions and, to the extent they have non-menial occupations, they are compensated at a level below their White counterparts. Finally, the court considered the blatantly inferior quality and quantity of education received by Blacks from the past to the present. On the basis of this evidence the Court concluded that Blacks in Burke County suffered from severe socio-economic depression, that such depression was caused, at least in part, by past discrimination, and that such depression has a direct negative impact on the opportunity for Blacks to effectively participate in the electoral process. That finding is not clearly erroneous.

■ The next factor considered by the District Court was lack of access to the political process.[43] On the basis of (1) the inability of Blacks to participate in the operation of the local Democratic party, and the effects thereof, (2) the County Commissioners' failure to appoint Blacks to local governmental committees, in meaningful numbers, and (3) the social reality that person-to-person relations, necessary to effective campaigning in a rural county, was virtually impossible on an interracial basis because of the deep-rooted discrimination by Whites against Blacks, the District Court concluded that historical and present discrimination operated in conjunction with the officially sanctioned electoral system to unfairly limit the access of Blacks to the political process. That finding is not clearly erroneous. Of particular significance to the District Court and to this Court is the manner in which the local Democratic party is

operated, and the effects thereof. As the District Court correctly pointed out, "[e]lection in the [Democratic] primary is 'tantamount' to election to the office." *Order* at 19. Moreover, the local Democratic Executive Committee is empowered by state law to provide poll watchers, *Ga.Code Ann.* § 34–1310(b), poll officers, *Ga.Code Ann.*, § 34–501, and substituted nomination, *Ga. Code Ann.* § 34A–903. The committee also elects delegates to be sent to the various political conventions. We think it clear that the ability to operate successfully in the framework of the existing Democratic party structure is one of the keys to electoral victory. Given the fact that only one of the committee's twenty-four members is Black, it becomes painfully clear that the existing electoral system could be purposefully used in conjunction with what must be viewed as the political reality in Burke County to continue the official and unofficial policy of excluding Blacks from participation in that system.

The last of the so-called primary factors considered by the District Court was the state policy behind the at-large election system. The Court stated that

> while [the policy is] neutral in origin, *it has been subverted to invidious purposes.* (emphasis added). Since it is a statute of local application, its enactment, maintenance or alteration is determined by the desire of representatives in the state legislature of the county affected. Burke's representatives have always been Whites. Accordingly, they have retained a system which has minimized the ability of Burke County Blacks to participate in the political system.

*Order* at 22. We hold that this finding of the District Court, based as it must be on his unique opportunity to assess the local political and social environment, is not clearly erroneous.

In addition to the primary criteria, the District Court considered a number of fac-

---

**43.** The District Court considered evidence of actions by public officials and actions by private individuals or groups that could be mani-

pulated by public officials to perpetuate a system whose purpose was the exclusion of Blacks.

tors which this Court, as well as the Supreme Court, have indicated enhance the opportunity to use an electoral system for invidious purposes. The first factor is that the size of the questioned district is large. In that regard, the District Court pointed to the fact that "Burke County is nearly two-thirds the size of Rhode Island, comprising an area of approximately 832 square miles." *Order* at 22. The Court goes on to say that it "finds as a matter of law, that the size of the county tends to impair the access of Blacks in Burke County to the political process." *Id.* at 23. This being a conclusion of law, we are not restricted by a clearly erroneous standard. Nonetheless, our independent analysis of this factor leads us to agree with the District Court's conclusion.

The second enhancing factor considered by the District Court was the majority vote requirement. The Court points out that, by the terms of the statute, "county commissioners are to run at-large, that the victor must be elected by a majority vote, *Ga.Code Ann.* § 34–1513, and that candidates run for specific seats, *Ga.Code Ann.* § 34–1015." *Order* at 23. The Court also noted that, though there is no anti-single shot provision, the requirement that candidates run for numbered posts has potential effects that are equally adverse. The District Court concluded that the presence of these factors enhanced the likelihood that the electoral system could be used for discriminatory purposes. This conclusion is sound and well supported.

The final factor considered by the District Court is the presence or absence of a residency requirement. Burke County has no residency requirement, despite the fact that candidates must run for numbered posts. As the District Court said, "[a]ll candidates could reside in Waynesboro, or in "lilly-white" neighborhoods. To that extent, the denial of access becomes enhanced." *Order* at 24.

■ Having concluded that all the relevant primary and enhancing factors were established in plaintiff's favor, the only question that remains is whether the District Court properly could have drawn an inference therefrom that the at-large electoral system in Burke County has been maintained for the purpose of restricting the access of the county's Black residents to that system. As we indicated earlier, the trial court is to make its conclusion on the basis of the totality of the circumstances, not merely by measuring which party proved the presence or absence of the greatest number of factors. In making his judgment, Judge Alaimo did not have the benefit of the Supreme Court's decision in *Mobile v. Bolden*, nor, obviously, of our discussion of that case here. Nonetheless, a careful reading of Judge Alaimo's order leads us inescapably to the conclusion that he made the type of independent inquiry into intent that we have said is necessary. Moreover, his order leaves no doubt as to his conclusion that the at-large electoral system in Burke County was maintained for the specific purpose of limiting the opportunity of the county's Black residents to meaningfully participate therein. At one point, for example, Judge Alaimo makes the unequivocal statement that, "[m]oreover, it is evident that the present scheme of electing county commissioners, although racially neutral when adopted, is being *maintained* for invidious purposes." (emphasis in original) *Order* at 7.

Judge Alaimo's evaluation of all the relevant evidence was thorough and even-handed. His conclusion that the electoral system was maintained for invidious purposes was reasonable, and in fact virtually mandated by the overwhelming proof. We affirm the District Court's judgment.[44]

*THE RELIEF GRANTED*

■ The District Court ordered that the five county commissioners for Burke Coun-

---

**44.** One question left unresolved by the various opinions in *Bolden* is whether the plaintiff must demonstrate that the system was maintained "because of not merely in spite of" its adverse effects, or simply establish that the adverse effects were the foreseeable consequences of maintaining the system. The plurality would require the former, whereas Justice Marshall,

ty be elected from single-member districts in all future elections. The Court adopted the original plan submitted by the plaintiff, because it had substantially smaller population deviations among the districts than the plan submitted by the defendants. Such relief was proper.

At the outset, we note, as did the District Court, that there were no "special circumstances" that would justify an exception to the general rule that at-large districts are not favored.[45] Moreover, this is not a case like *Mobile v. Bolden*, in which an entire form of government was abandoned without consideration of the valid local interests in the maintenance of the existing system. In this case, unlike *Bolden*, the Court's order does not affect the existing allocation of executive and administrative responsibilities among the Burke County commissioners. Nor does the relief ordered require any other alteration in the operation of that governmental unit. In fact, the Court's order does not even change the number of county commissioners that are to be elected. This is another factor that distinguishes the remedy in *Bolden* from that ordered here.

We conclude that the remedy ordered is not only permitted, but, under the facts

presented, it may be required. The picture that plaintiffs paint is all too clear. The vestiges of racism encompass the totality of life in Burke County. The discriminatory acts of public officials enjoy a symbiotic relationship with those of the private sector. The situation is not susceptible to isolated remedy.[46] While this Court is aware of its inability to alter private conduct, we are equally aware of our duty to prevent public officials from manipulating that conduct within the context of public elections for constitutionally proscribed purposes. For all the reasons set forth herein, the judgment of the District Court is AFFIRMED.

HENDERSON, Circuit Judge, dissenting:

Although I can appreciate the monumental task of the district court in its articulation of findings of fact and conclusions of law, I am of the opinion that this case should be remanded for reconsideration in light of *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

The constitutionality of the at-large voting system for county commissioners in Burke County, Georgia, has not been tested by the *Mobile* criteria. The majority opin-

---

in dissent, indicated that the latter would suffice. We conclude that Judge Alaimo's order would satisfy either standard and, therefore, we specifically do not attempt to resolve that dispute. Moreover, we have a difficult time understanding the substance of the conflict. It seems to us that if a plaintiff establishes that a system was maintained for discriminatory purposes, he had *a fortiori* proven that it was maintained "because of" its discriminatory effects.

45. "We have made clear, however, that a court in formulating an apportionment plan as an exercise of its equity powers should, as a general rule, not permit multimember legislative districts. "[S]ingle-member districts are to be preferred in court-ordered legislative reapportionment plans unless the court can articulate a 'singular combination of unique factors' that justifies a different result. *Mahan v. Howell*, 410 U.S. 315, 333, 93 S.Ct. 979, 989, 35 L.Ed. 320." *Connor v. Finch*, 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465." 100 S.Ct., at 1499.

46. The problems of Blacks in Burke County should not be viewed in a vacuum. The present treatment of Blacks in the South is directly traceable to their historical positions as slaves. While many individual political leaders have attempted to bring meaningful reforms to fruition, it is equally true that the White communities, for the most part, have fought the implementation of programs aimed at integration with every device available. A District Court ordering relief in a case such as this must take cognizance of that fact. As a learned member of this Court recently recognized, "... if we, as judges, have learned anything from *Brown v. Board of Education*, it is that prohibitory relief alone affords but hollow protection from continuing abuse by recalcitrant governments. Facing this situation, judges have the option of either declaring that litigants have rights without remedies, or fashioning relief to fit the case." F. Johnson, *In Defense of Judicial Activism*, 28 *Emory L.J.* 901, 910 (1979).

ion recognizes that the district court's decision was made without the guidance of *Mobile*, but it states that the inquiry into discriminatory intent actually undertaken by the trial court satisfies that standard.

*Mobile* does more than reaffirm the necessity for a showing of discriminatory intent, however. *Mobile* also abolishes the simple "aggregate of factors" approach of *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) aff'd. sub nom. *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 196 (1976), heretofore followed in this circuit. In its place, *Mobile* institutes a "totality of the circumstances" test in which the *Zimmer* factors still possess relevance but to varying degrees. Thus, past official discrimination is not to be treated as an "original sin" and unresponsiveness by elected officials is "relevant only as the most tenuous and circumstantial evidence of the constitutional invalidity of the electoral system under which they attained their offices." *City of Mobile v. Bolden*, 100 S.Ct. at 1503, 64 L.Ed.2d at 63.

*Zimmer* was not the sole measure by which the findings of fact of the district court were tailored. That order was gauged by a hybrid standard referred to as the *Zimmer-Kirksey* test. *Kirksey v. Board of Supervisors*, 554 F.2d 139 (5th Cir. 1977) instructs that depressed socio-economic status which hinders participation in community affairs signals a denial of access to the political process. *Kirksey v. Board of Supervisors*, 554 F.2d at 143. In the findings of fact of the district judge, depressed socio-economic status was accorded consideration equal to that given the *Zimmer* factors. Yet, the *Mobile* plurality considers historical and social factors, apart from the discrimination generated by official state action, to be "gauzy sociological considerations [which] have no constitutional basis." *City of Mobile v. Bolden*, 100 S.Ct. at 1504 n. 22, 64 L.Ed.2d at 64 n. 22.

Mr. Justice Stevens joined the *Mobile* plurality decision to retain Mobile's commission form of government as constitutionally permissible. I find two policy considerations raised in his concurrence to be persuasive. Each notion counsels the judiciary to exercise restraint in voting dilution cases. First, at-large systems will always disadvantage one or more minority groups struggling for political power. Yet, the essence of democracy is majority rule and a voting structure must be judged by a standard that "allows the political process to function effectively." *City of Mobile v. Bolden*, 100 S.Ct. at 1509, 64 L.Ed.2d at 70. Second, the standard chosen cannot hold reprehensible all detrimental effects on an identifiable political group because such a test would invite a host of voting dilution cases sure to plunge the judiciary into a "voracious political thicket." *City of Mobile v. Bolden*, 100 S.Ct. at 1514, 64 L.Ed.2d at 75. Reading Mr. Justice Stevens' concurrence together with the plurality opinion leads me to conclude that before a court may intrude into local political processes, it must possess stronger evidence of invidious motivation than past social discrimination and economic deprivation.

An exposition of evidence more detailed than that made by the district judge in the *Mobile* case is seldom seen. *Bolden v. City of Mobile*, 422 F.Supp. 384 (S.D.Ala.1976). Most of the evidence here is of a similar character. Yet in the eyes of the Supreme Court, the findings set forth in *Mobile* were insufficient to prove unconstitutional voting dilution because the data was not viewed in the proper perspective. The conclusions drawn from the evidence gathered below may suffer from the same infirmity. As I read *Mobile*, it demands emphasis on evidence of official state denial of equal participation in the slating and election process and eschews heavy reliance on socio-economic data. A remand for reassessment of the record evidence, together with additional evidence, if necessary, seems to be the appropriate course of action. For these reasons, I respectfully dissent.