**POLITICAL CIVIL VOTERS ORGANIZATION and J.R. Roberson, Plaintiffs,**

v.

**CITY OF TERRELL, Defendant.**

**Civ. A. No. 3–81–1103–H.**

United States District Court, N.D. Texas, Dallas Division.

April 8, 1983.

Elizabeth K. Julian, Michael Daniel, Julian, Daniel & Villarreal, Dallas, Tex., for plaintiffs.

William Charles Bundren, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., David Lewis, City Atty., City of Terrell, Terrell, Tex., for defendant.

## MEMORANDUM OPINION

SANDERS, District Judge.

This case arises out of a challenge to the Charter for the City of Terrell, Texas. The Charter currently provides for the election of five city councilmen for staggered terms

in at-large elections. Councilmen run for numbered positions, and they must receive a majority of votes. The Charter was last amended in 1973. The 1973 amendment provided residency requirements for three of the council positions. The other two positions, Mayor and Mayor Pro Tem, do not have residency requirements.

Plaintiffs Political Civil Voters Organization ("PCVO") and J.R. Roberson ("Roberson") challenge the charter on several grounds. First, they claim that the Charter was created and is maintained for purposes of invidious discrimination in violation of the Fourteenth and Fifteenth Amendments. Second, they assert that the Charter has the effect of diluting the Black minority vote in contravention of section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

■ Although the determination of discriminatory intent, as opposed to discriminatory effect, involves a different legal standard, there are many factors in voting dilution cases which are relevant both to intent and effect. *Cross v. Baxter,* 604 F.2d 875, 880 n. 9 (5th Cir.1979). Specifically, in *Zimmer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir.1973), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975), the Fifth Circuit listed eight relevant factors. Later cases interpret *Zimmer* as presenting four "primary" factors and four "enhancing" factors. *See Cross v. Baxter,* 604 F.2d 875, 879 (5th Cir.1979); *Lodge v. Buxton,* 639 F.2d 1358, 1379–80 (5th Cir.1981), *aff'd sub nom. Rogers v. Herman Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). The *Zimmer* criteria are not exclusive, and can be replaced or supplemented as is appropriate to the individual facts of a case. *See Lodge v. Buxton, supra,* 639 F.2d at 1375. The Court has carefully considered the *Zimmer* criteria, as well as other factors, and its findings and conclusions as to those criteria and factors are as follows.

### A. Primary Factors

#### 1. Lack of Access to the Political System

In *Zimmer,* the Court considered the "lack of access" factor solely in terms of access to the candidate slating process. 485 F.2d at 1305. Terrell does not employ a candidate slating process, and, as such, the "access" factor is inapplicable in this case. In *Cross v. Baxter,* however, the Fifth Circuit expanded the "access" factor to encompass access to the political system generally. 604 F.2d 875, 878 (5th Cir.1979); *see also McIntosh County Branch of the NAACP v. City of Darien,* 605 F.2d 753, 757 (5th Cir. 1979). The Court specifically included in the "lack of access" factor "such direct governmentally sanctioned exclusions as the poll tax . . . ."

In this case, Terrell has employed a "direct governmentally sanctioned exclusion" similar to the poll tax. The Terrell City Charter requires all candidates for public office in Terrell to be owners of real property. *See* Plaintiffs' Exhibit ("PX") 7. This requirement, like the poll tax, impacts more adversely on blacks than on whites in Terrell. Although about one-third of Terrell's population is black, Plaintiffs' Exhibit 65 shows that substantially fewer than one-third of the owner-occupied homes in Terrell are found in census track 505, the predominantly black area. *See also Lodge v. Buxton,* 639 F.2d 1358, 1378 (5th Cir.1981). In fact, the overall effect of a property requirement on minority political participation is generally so acute that the Fifth Circuit has stated that "[C]ases involving literacy tests, or *property requirements* are, by comparison, easier to decide. The most obvious purpose for the creation of such systems is clearly discrimination." *Id.* at 1363. (Emphasis added).

Several persons testified at trial and during depositions that Terrell does not enforce its property ownership requirement. *See, e.g.,* Deposition of Bobby Bishop ("Bishop Deposition"), p. 75, line 17 to p. 76, line 1. The requirement, however, is not an ancient relic that remains on the books through inadvertence. In 1973, the Charter Revision Committee set aside the old city charter, started from scratch, considered the property requirement, reworded it, and

again included it in the Terrell Charter. Deposition of Arther Fineout ("Fineout Deposition"), p. 35, lines 8–12; p. 101, line 15 to p. 103, line 14. Moreover, Terrell has admittedly never publicized its alleged policy of nonenforcement. Bishop Deposition, p. 75, line 17 to p. 76, line 25. Thus, the existence of the requirement may well discourage otherwise qualified candidates from running for public office. Terrell's property ownership requirement, then, acts to impede minority access to the political system.

### 2. Tenuousness of the state policy underlying use of the at large voting system

Another "primary" factor under *Zimmer* is the "tenuousness" of the state policy underlying use of the at large voting system. In this case, the original justification for instituting an at large system does not appear to be tenuous. There is no state policy against at-large systems, *cf. Zimmer v. McKeithen*, 485 F.2d 1297, 1304 (5th Cir. 1973), and members of the 1973 Charter Revision Committee expressed apparently sincere concerns over the "ward politics" they believed to result from single member districts. Fineout Deposition, p. 66, lines 14–20.

Terrell's reason for *maintaining* an at-large system, however, is quite tenuous. In April of 1979, the first black candidate for Mayor of Terrell was defeated at the polls. He filed an election contest, alleging that poll workers improperly refused to let certain black citizens vote. As part of a settlement agreement in that case, Terrell agreed to set aside its objections to "ward politics" and to submit the question of single member districts to the electorate. *See* PX 27, page 4. The settlement agreement states as follows:

At the next municipal election to be held on the first Saturday in April 1980, a single member district plan will be submitted to the voters of the city. Said plan to have the approval of the U.S. Department of Justice, and if passed, to go into effect at the next municipal election, the first Saturday in April, 1981. *Id.*

In the April 1980 election the single member district proposal passed 599–499. The City Council determined, however, that the April 1980 vote was merely a "straw vote" and that the single member district issue needed to be resubmitted as a formal charter amendment. Certain black citizens sought to enjoin the holding of a second election but were unsuccessful. *See* PX 26, p. 38. In August 1980, the single member district proposal was again submitted. There was a much smaller turnout and the proposal was defeated.

The City Council's two-tiered amendment procedure concerning the single member district proposal did not comport with either Section 12.12 of the Terrell Charter, or Article 1170 of Texas Revised Civil Statutes Annotated. *See* PX 7, p. 32. Moreover, the two-tiered procedure was not submitted to or approved by the Attorney General. Yet, the stated reason for retaining an at-large system after the April 1980 referendum was that the city had to follow its Charter and had to follow the "vote of the people". Testimony of Danny Wood. The Court finds that Terrell's policy reasons for maintaining an at large system after April 1980 are extremely tenuous.

### 3. The Existence of Past Discrimination that in General Precludes the Effective Participation in the Election System

■ The Court takes judicial notice of the rampant official discrimination in recent history in Texas against blacks. *See, e.g.,* Tex.Elec.Code Ann., art. 5.09 (poll tax; repealed 1967); Texas Penal Code, Art. 1661 (separate coaches, repealed 1967); Tex. Rev.Civ.Stat. Art. 2900 (segregated schools, repealed 1969); Tex.Rev.Civ.Stat. Art. 6070e (separate state parks, repealed 1969); Tex.Rev.Civ.Stat. Art. 5920 (separate bath facilities, amended 1969); Tex.Rev.Civ.Stat. Art. 3107 (white primary, repealed 1927).

Official discrimination in Terrell ended, for the most part, in the 1960's. Terrell schools began "freedom of choice" in 1965,

and totally integrated in 1968. Furlough Deposition, p. 9, lines 15–18. As of 1963, Terrell soda fountains and the town skating rink were still segregated. *Id.* at p. 81, line 5 to p. 82, line 4. At present, there is still a "black" and a "white" cemetery, although no evidence was produced showing that the segregation is a result of an official Terrell policy. *Id.* at p. 46, lines 13–15; Testimony of Danny Wood.

Blacks in Terrell are in a generally depressed socio-economic position. According to the 1980 census, 40.5% of the blacks in Terrell have incomes below the poverty level, whereas only 7.2% of the whites had incomes below that level. *See* PX 68. Similarly, 41.2% of Terrell's blacks have only an elementary school education, while 23.3% of the whites have only an elementary school education. *See* PX 69. Blacks in the Terrell area also occupy disproportionately few places in the administrative and professional fields. *See* PX 66.

Defendant questions the extent to which the past discrimination and current depressed socio-economic conditions effect the ability of blacks in Terrell to participate in the election system. *See Zimmer, supra,* 485 F.2d at 1305. Defendant asserts that Plaintiffs, in order to make a prima facie case as to the lingering effects of past discrimination, must show a disproportion in *both* "voting registration and election of minority representatives...." *Cross v. Baxter,* 604 F.2d 875, 881 (5th Cir.1979). There is some support for Defendant's assertions. Several Fifth Circuit cases list both factors as part of the plaintiff's "burden". *Id.; McIntosh County Branch of the NAACP v. City of Darien,* 605 F.2d 753, 759 (5th Cir.1979). In other cases, however, the Fifth Circuit has taken a less rigid approach and has stated that "[i]nequality of access is an inference which flows from the existence of economic and educational inequalities." *Kirksey v. Board of Supervisors of Hinds County, Mississippi,* 554 F.2d 139, 145 (5th Cir.) *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

In *Lodge v. Buxton,* 639 F.2d 1358 (5th Cir.1981), the Court found lingering effects of past discrimination, despite a substantial recent increase in minority voter registration. *Id.* at 1377–78. In this case, as in *Lodge v. Buxton,* minority voting registration has increased dramatically in the last decade. In fact, Defendant's calculations show that blacks in Terrell are registered to vote in significantly higher proportions than are whites in Terrell. *See* Defendant's Exhibit ("DX") 77–79.

The Court finds that in this case, as in *Lodge v. Buxton,* the increase in voter registration does not preclude a finding that the effects of past discrimination still linger in Terrell and impede minority access to the political system. In Terrell, blacks represent 37.6% of the overall population, and 33.5% of the voting population, *see* Pretrial Order, p. 8, yet black representation has never exceeded one of five, or 20%, on the city council. Numerous witnesses, including witnesses for Defendant, testified that one reason disproportionately fewer blacks are elected is because blacks are often not personally "known" to the majority of the community, which lives in north Terrell. It is clear to the Court that a major reason for the white majority's lack of familiarity with many black candidates is the severe de facto segregation of housing in Terrell. The area south of the railroad tracks in Terrell is approximately 97.5% black and the area north of the railroad tracks is approximately 94.6% white. *See* DX 77, p. 2. Although no evidence of current official policies encouraging segregated housing was introduced, the Court finds that past official actions, particularly the maintenance of segregated schools, strongly influenced the establishment of racially segregated housing in Terrell. The effects of those official, discriminatory acts clearly "lingers" in the housing patterns. Those housing patterns, in turn, greatly impede the ability of blacks to enter the political system in Terrell. Based on the particular facts of this case, then, the Court finds that the present effects of past discrimination in Terrell do impede black participation in Terrell politics.

#### 4. Unresponsiveness

The Court has considered the City of Terrell's responsiveness to minority needs in two basic areas: provision of city services to minorities and city hiring and appointment of minorities.

#### (a) Provision of City Services

##### (1) Location and Staffing of Polling Places

Terrell has only one polling place for city elections. It is located in the City Hall, which is in north Terrell. South Terrell residents have requested a polling place in south Terrell, as is provided in the county elections. Henderson Deposition No. 2, p. 28. In state elections, no election precinct can contain more than 2,000 voters. Tex. Elec.Code Art. 2.04(2). Presumably, this requirement was instituted to promote voter convenience. Terrell has a total of 5564 registered voters, 2089 of whom live in south Terrell. DX 77. Terrell officials concede that, due to Terrell's population growth, not all residents can walk to city hall, and that an additional polling place would be more convenient for voters. *Id.* The City, however, has refused to open a south Terrell polling place. Henderson Deposition No. 2, p. 28. The Court finds that, as to location of polling places, the City has been unresponsive to minority needs.

As to the staffing of the polling facilities, the Court notes that the percentage of black election officials during the Terrell elections since 1970 are approximately as follows: 1970—0%; 1971—6%; 1972 through 1976—0%; 1977—20%; 1978—3.6%; 1979—0%; 1980—13%; 1981—26%; 1982—18%. *See* PX 24. Although Terrell has made progress since 1970 in appointing black election officials, the number of such appointees is still disproportionately low. The Court finds that in the area of staffing of polling places, Terrell has been unresponsive to minority needs.

##### (2) Drainage

In recent years, the City of Terrell has made dramatic improvements in south Terrell drainage. The City Manager, Paul Henderson, testified that the drainage in south Terrell is now better than that in north Terrell. Henderson Deposition No. 2, p. 41, lines 1–5. The Court finds that Terrell has been responsive to minority needs in the area of drainage.

##### (3) Water

In or around the 1960's, south Terrell suffered from such low water pressure that at least one building burned due to an inadequate water supply. Deposition of Frank Smith ("Smith Deposition") pp. 10–12; Testimony of J.R. Roberson. That problem, however, appears to be reduced. The City has admitted that there is still inadequate water pressure in one part of the black area, but it notes that there are four sections in the white area that are comparable in that regard. *See* PX 33, p. 4. The City's latest capital improvement plan includes installing an additional large water main in the black area. *Id.* An investigation by the Office of Revenue Sharing ("ORS") indicated that although the "black area" of Terrell constitutes about one-third of the city, it contains 42% of the largest size water mains. PX 33, p. 3; *see also* Smith Deposition at 11–12. Defendant's records show that 71% of the miles of pipe laid in Terrell since 1970 have been laid in south Terrell. PX 9. Plaintiffs persuasively assert that 71% of the pipe, only 30.2% actually went to the black residential area, and the rest went to industries benefiting the city generally. *See* Plaintiffs' Post Trial Brief, p. 25. Nevertheless, the Court finds that the total, overall figures show that the City of Terrell has been responsive to minority needs in the area of water services.

##### (4) Sewer

In Terrell, indoor plumbing and sewage facilities were installed in north Terrell prior to being installed in south Terrell. Smith Deposition, p. 35. The sewage services in south Terrell, however, have greatly improved in recent times. *Id.* An ORS investigation revealed that there are currently 19 occupied dwellings in Terrell with-

out sewer service, including 9 black dwellings. PX 33, p. 4. Defendant's calculations indicate that 73% of all sewer pipe laid in Terrell from 1970–82 was laid in south Terrell. DX 9. Plaintiffs assert that only 11% of that pipe directly benefited the black community, while the rest went to industrial and other city wide uses. *See* Plaintiffs' Post Trial Brief, pp. 25–26. Even assuming Plaintiffs' contentions are correct, no significant disparity has been shown. North Terrell received 28% of the pipe, and north Terrell contains about two-thirds of the Terrell population. South Terrell received about 11% and contains the other one-third. The Court finds that, overall, the City of Terrell has been responsive to minority needs in the area of sewer services.

### (5) *Cemeteries*

Two cemeteries exist in Terrell, a black cemetery and a white cemetery. Furlough Deposition, p. 46, lines 13–15; Testimony of Danny Wood. In 1977, when Frank Smith was appointed to the city council, the black cemetery received $2,000 per year from the city and the white cemetery received $12,-000 per year. Testimony of Frank Smith. Although in 1983 the city council, for the first time, allocated an equal amount for each cemetery, the Court finds that the City has not been responsive to minority needs in the area of cemetery maintenance.

### (6) *Fire Protection*

As noted earlier, Terrell is divided by railroad tracks that run east and west, separating north and south Terrell. The only fire station is north of the tracks, and there are no overpasses or underpasses through which to avoid the railroad crossings. On several occasions, fire trucks have been delayed by trains in reaching south Terrell fires. *See* DX 82. Although no substantial damage has so far been caused by such delays, the city recognizes that the current situation presents grave risks. The ORS has investigated Terrell concerning violations of the Local Assistance Act of 1972 based on Terrell's failure to provide accept-

able fire safety to its black residents. *See* PX 60.

Residents of south Terrell have repeatedly requested that a fire station or substation be located in south Terrell. *See* Henderson Deposition No. 2, pp. 36–37. The city has decided, however, that instead of building a fire station in south Terrell, it will wait for the State of Texas to build an overpass connecting north and south Terrell. *See* PX 63. The state does have a proposal before it that includes a Terrell overpass. The proposal, however, has not been fully approved and will not be completed until 1988 at the earliest. *See* PX 61. The ORS apparently has approved the use of an overpass rather than a fire substation, *see* PX 63. Nevertheless, the Court finds that the city's current policy, which consists of waiting to see if the state will build the overpass, involves too many uncertainties to be considered "responsive" to minority needs.

### (7) *Police Protection*

Prior to 1974, the Police Department basically assigned its officers on the basis of race, with 4 black patrolmen servicing south Terrell, and 12 white patrolmen servicing north Terrell. Testimony of Joe Patton. In 1974, however, the police department was reorganized such that all patrolmen now service areas that include both north and south Terrell. The Court finds no credible evidence that blacks in Terrell have received police protection unequal to that of whites.

### (8) *Medical Services*

In 1975 the City of Terrell constructed the Terrell Community Hospital in south Terrell. The hospital provides a readily accessible emergency facility that can be reached by south Terrell residents without a risk of delays by trains. The Court finds that in the area of medical services, the city has been responsive to minority needs. *See* DX 111.

**(9) Housing**

In numerous applications to HUD for Community Development Funds, Terrell has stressed the need for housing assistance for low income residents of south Terrell. See PX 35–41. There are currently three assisted housing projects in Terrell, all of which are privately owned and federally assisted. Testimony of Jack Russell. The City does run a HUD Section 8 existing housing rental program although only one of the over 29 black families lives in north Terrell. Henderson deposition No. 2, pp. 18–21. Terrell has received about $850,000 in federal housing grants since 1979, and 100% of it has been spent in south Terrell. Testimony of Jack Russell. The City has been advised by a management consultant that Terrell's chances for additional federal funding would be greater if Terrell placed some assisted housing in north Terrell, but it has no plans to do so. Id.

The Court is concerned by Terrell's failure to propose more integrated assisted housing and thus maximize its chances of receiving additional federal funds. Nevertheless, the Court finds that Terrell has worked diligently to obtain funding for housing assistance. The Court finds that, in the area of housing, Terrell has been responsive to minority needs.

**(10) Paving of Streets**

It is undisputed that prior to 1970, there was a significant inequality in the paving of streets in south Terrell compared with the streets in north Terrell. See Deposition of Stan Ballard ("Ballard Deposition"), pp. 35–37. Prior to 1970, less than 25% of the streets in south Terrell had any form of pavement. Ballard Testimony. Since 1970, however, the city has made significant improvements in south Terrell roads. In fact, between 1970 and 1982, 76% of the roads paved in Terrell were located in south Terrell. See DX 9.

The parties presented conflicting testimony as to whether, after the city's improvements, an inequality still exists between the roads in south and north Terrell. Of the paved roads in north Terrell, about 60% are "curb and gutter", which involves the laying of underground drainage pipes and concrete curbs. In south Terrell, only about 20% of the roads are curb and gutter, and the rest have open drainage ditches. Testimony of Stanley Ballard. Although the city of Terrell favors curb and gutter streets as a matter of policy, the city engineer, Stanley Ballard, testified that many persons, including himself, prefer open drainage streets. Ballard conceded, however, that open drainage streets make parking more difficult.

Ballard further testified that the type of paving laid on a particular street depended on the choice of the property owners on that street. The frontage owners must sign a petition requesting paving of their streets and submit it to the city council. Ninety percent of the owners of the homesteads on the street must sign the petition. Then, the owners choose the type of paving, and they pay two-thirds of the cost. The city pays the remaining one-third. The city will not put in curb and gutter streets unless: (1) 90% of the homestead owners agree to pay the extra costs; and (2) the street is at least 31 feet wide. The city requires that streets be paved with curb and gutter if the values of the adjacent property at $7 per frontage foot or more.

Although the city's assessment policy is applied equally in north and south Terrell, it impacts differently in the two areas. In south Terrell, a higher percent of the homes are renter occupied, see PX 65, which may make it more difficult to obtain the necessary 90% owner consent. Also, the average width of streets in south Terrell is 21 feet, making it harder for south Terrell to meet the width requirement. Testimony of Stanley Ballard. The property values in south Terrell are also considerably lower than those in north Terrell, see Plaintiffs' Exhibit 65, p. 2, such that fewer streets in south Terrell would qualify under the $7 per foot rule. Thus, the differential between north and south Terrell in the amount of curb and gutter streets cannot solely be attributable to the choice of the residents.

The Terrell City Manager, Paul Henderson, testified that the paving in south and north Terrell is substantially unequal. Second Deposition of Paul Henderson, ("Henderson Deposition No. 2"), p. 40, lines 19–24. The Court agrees with this conclusion. Despite vast improvements, the city is still not fully responsive to minority needs in the area of street improvements.

### (11) *Future Planned Expenditures*

In 1981 Terrell passed a $15,000,000 capital improvement bond. Defendant asserts that of that $15,000,000, $6,368,000 is specifically targeted toward south Terrell. DX 76. Plaintiffs persuasively argue that $1,980,000 of the $6,368,000 should more properly be allocated to the "general benefit" category, rather than to south Terrell. *See* Plaintiffs' Post Trial Brief, p. 26. Nevertheless, such a reallocation still leaves $4,406,000 earmarked for south Terrell, as opposed to $1,342,000 for north Terrell. Based on those statistics, it is clear to the Court that as to planning for future capital expenditures, Terrell has been responsive to minority needs.

### (12) *Zoning Permits*

The city council, in the last few years, denied a permanent operating permit to a company seeking to slaughter animals at a meat plant in south Terrell. The black community strongly opposed the establishment of a slaughterhouse in south Terrell. Although Plaintiffs allege that slaughtering had occurred for some time prior to the denial of the permit, it is unclear whether the slaughtering was brought to the city council's attention at that time. *See* Plaintiffs' Post Trial Brief, p. 26; Testimony of Gilbert Willie. The Court finds that the City of Terrell was responsive to minority needs in denying the slaughtering permit.

### (b) *City Hiring and Appointment of Minorities*

### (1) *Hiring*

Although blacks in Terrell constitute approximately 33% of Terrell's population above 18 years of age, the percentage of blacks hired by the City of Terrell is significantly less than 33%. *See* Pretrial Order, filed February 14, 1983, p. 8; .PX 64, pp. 1–2. A summary of the information contained in Terrell's EEO4 forms shows that in the past eight years the percentage of blacks employed by Terrell has been as follows: 1973—29%; 1974—21%; 1975—14.6%; 1976—15.7%; 1977—18.6%; 1978—18%; 1979—19.6%; 1980—16.4%; 1981—20.2%. *See* PX 64, pp. 1–2. The city's black employees constitute a disproportionately high percentage of the lower paying jobs. From 1973 to 1980, no black Terrell employees earned more than $13,000 per year, although 75 white employees earned more than $13,000 during that period. *See* PX 64, p. 1. In 1981, three black employees earned more than $13,000 per year, as compared to 46 white employees. *See* PX 64, p. 2. The city has employed approximately four black policemen since 1974. The city employed approximately 16 officers in 1974, and it currently employs approximately 20 officers. Testimony of Joe Patton. Of the seven paid firemen currently employed by Terrell, one is black. He is the first black Terrell fireman, and he was hired three months prior to trial. There are no black department heads in the City of Terrell. Deposition of John Douglas Norton, p. 58. Overall, in the area of hiring, the Court finds that the City has not been responsive to minority needs.

### (2) *Appointments*

The overall composition of the city boards and commissions is 20% black. One-half of the total blacks serving on boards and commissions serve on the Community Development Advisory Commission. PX 72. The Community Development Advisory Commission must, under HUD guidelines, have representation from the target area (south Terrell). On four of the city's eight boards and commissions, there are no black representatives. The Court finds that in the area of city appointments, the City of Terrell has been unresponsive to minority needs.

*(c) Responsiveness Overall*

█ The Court recognizes that in assessing responsiveness, the burdens are as follows: "[o]nce the plaintiffs have demonstrated recent persuasive official unresponsiveness to minority needs, the burden shifts to the defendants to demonstrate that the unresponsiveness of the past is no longer indicative of present government unresponsiveness." *Cross v. Baxter,* 604 F.2d 875, 883 (5th Cir.1979). The Court finds that in the following areas, Plaintiffs have met, and Defendant has failed to meet, the above-stated burdens: (1) location and staffing of polling places; (2) cemetery services; (3) fire protection; (4) paving of streets; (5) city hiring; (6) city appointments. In the following areas, Plaintiffs have met their above-stated burden, but Defendant has shown that the past is no longer indicative of present government unresponsiveness: (1) drainage; (2) water services; (3) sewer services; (4) police protection; (5) medical services; (6) housing; (7) future planned expenditures; (8) zoning permits.

Although in their numbers, the city is responsive in a majority of areas, the Court finds that, overall, the City is unresponsive. The City's lack of responsiveness in the area of location and staffing of polling places and city hiring and appointments is so significant that the Court cannot conclude that Terrell is responsive to minority needs.

### B. Enhancing Factors

Under *Zimmer, supra,* the existence of the four following factors "enhances" Plaintiffs' proof of discrimination.

#### 1. Unusually large districts

The Court finds that the City of Terrell is not an "unusually large district."

#### 2. Majority Vote Requirement

Terrell employs a majority vote requirement. Under this requirement, a candidate who acquires a plurality, but not a majority of the votes must compete in a runoff election with the top contender.

#### 3. Anti-single Shot Provisions

Terrell employs a numbered place system which acts as an anti-single shot provision. If the places on Terrell's city council were not numbered, then a minority group could cast only one of its five potential city council votes, thus weighing its vote for that one person more heavily. The existence of numbered places with head to head races, eliminates the advantage of such selective voting.

#### 4. Lack of Residency Requirements

Terrell requires that for three of the five city council positions, the candidates must reside in a particular geographic subdistrict. This residency requirement insures that at least one of the councilmen will be a resident of south Terrell.

### C. Other Factors

#### 1. Election of a Disproportionately Low Number of Minority Representatives

Both *Kirksey v. Board of Supervisors of Hinds County, Mississippi,* 554 F.2d 139, 143 (5th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), and the legislative history to the 1982 amendments to Section 2 of the Voting Rights Act cite the election of disproportionally few minority officials as an important factor. *Id.* See S.Rep. No. 97–417, 97th Cong.2d 1982 at 29 (Published in 1982 U.S.Code Cong. and Administrative News, p. 177). In Terrell, blacks have run against whites in city council elections on eight occasions. On seven of those occasions, the black candidate was defeated. Testimony of Prof. Charles Cotrell. The black victory occurred in 1969 when Herman Furlough, a black, defeated a white candidate for a city council position. When Furlough resigned from the city council, the council appointed Frank Smith, a black, to replace Furlough. Smith now runs from an essentially all black residency district, and has never had a white opponent. There has never been more than one black representative on the five member city council.

The Terrell Independent School Board has seven members, one of which is black. The first black was elected to the school board in 1966. He ran for position number seven and defeated a white. In 1975, he retired and another black was elected to position number seven. Since 1966, there has not been a white candidate for position number seven. Overall, since the late 1960's, black representatives have constituted approximately 20% of the city council and 14% of the school board. The Court finds that a disproportionately low number of blacks have been elected as Terrell officials.

### 2. Racial Campaign Tactics

The Court finds that the political campaigns in Terrell have not been characterized by overt or subtle racial appeals.

### 3. The Extent of Racially Polarized Voting

Racially polarized voting occurs when race is a predominant factor and influence in voter choice. Testimony of Prof. Charles Cotrell. Typically, the degree of racial polarity in voting is determined by examining election races in which blacks opposed whites, taking the percentage of voters who supported a candidate of their own race, and subtracting the percentage of voters who voted for a candidate of another race, to obtain a "racial polarization score". *Id.* For instance, if 80% of the blacks and 5% of the whites supported a black candidate, the racial polarization score would be 80 minus 5 or 75. A score of 60 or 70 is considered to show racially polarized voting. *Id.*

The typical procedure, however, cannot be directly applied to the City of Terrell. The City uses only one polling place for its elections. Thus, in any given election, the city cannot determine whether a candidate's votes came from south Terrell, the predominantly black area, or north Terrell, the predominantly white area. Defendant asserts that Plaintiffs, therefore, have failed to carry their burden as to showing the existence of racially polarized voting.

■ A ruling in favor of Defendant's position would be harsh, particularly in light of the fact that black residents have repeatedly requested a south Terrell voting box. Henderson Deposition No. 2, p. 28. A per se rule requiring that Plaintiffs show actual black-white city election breakdowns in order to demonstrate polarized voting would enable officials to negate an important element of a voting rights action simply by forcing all voters to come to one polling place. The Court finds that when direct evidence as to racial voting patterns is unavailable, the Court must look to indirect evidence.

One persuasive indirect indicator of racially polarized voting in this case is the results of the only Kaufman County Commissioner's race in which a black candidate has opposed a white candidate. In 1982 a black, Rev. B.H. Wyatt, ran against several white candidates. At County Box No. 5, which serves an area that is 95% black and that encompasses most of south Terrell, Wyatt received 96% of the votes. At County Box No. 20, which serves an area that is over 90% white and encompasses a significant portion of north Terrell, Wyatt received less than 5% of the vote. Testimony of Prof. Charles Cotrell. In that race, the racial polarization score was over 90, which is extremely high. *Id.* Although the voting districts in the County Commissioner's race do not exactly correspond to the areas of south and north Terrell, the Court finds that the areas are similar enough to be of probative value. The results of the Wyatt race for County Commissioner strongly indicate that racially polarized voting exists in Terrell.

The Plaintiffs' expert witness, Prof. Charles Cotrell, who has extensive experience in the area of voting rights, *see* PX 74, testified as to certain other indirect factors that a court may consider in determining whether polarized voting exists. Those factors include: a history of discrimination; a history of dual institutions; the percentage and degree of victories in black-white races; and the existence of de facto residential segregation. Prof. Cotrell particularly stressed the importance of segregated housing pat-

terns, and he testified that neighborhoods usually vote together. The Court finds that each of the factors cited by Dr. Cotrell weighs in favor of finding the existence of racially polarized voting.

It is true that the two incidents in which black candidates defeated white candidates show that the voters in Terrell do not always vote 100% along racial lines. Nevertheless, in 7 of 9 races in which black candidates opposed white candidates, the blacks were defeated. Racial polarization need not be perfect to be persuasive. The Court finds, based on the results of the Wyatt race, the number of black defeats in black-white races, and the factors delineated by Professor Cotrell, that racially polarized voting exists in Terrell.

### D. Totality of the Circumstances

In this case, the following factors weigh in favor of Plaintiffs: (1) lack of access to the political system; (2) tenuousness of the state policy underlying maintenance of the at-large system; (3) existence of past discrimination that inhibits effective participation in the election system; (4) unresponsiveness; (5) majority vote requirements; (6) anti-single shot provisions; (7) election of a disproportionately low number of minority representatives; and (8) racially polarized voting. The following factors weigh in favor of Defendants: (1) absence of unusually large districts; (2) existence of a residency requirement for three of the five city council positions; and (3) absence of racial campaign tactics.

■ The Court finds that, taken as a whole, the factors show discriminatory intent in the maintenance of the current election system. The Court, in reaching that conclusion, is particularly impressed by three factors: (1) the existence of the property ownership requirement; (2) the tenuousness of the reasons for maintaining the at-large system in light of the April 1980 referendum; and (3) the City's refusal to set up a south Terrell polling place. As the Fifth Circuit noted in *Lodge v. Buxton,* the "most obvious purpose" for creation of a property ownership requirement is discrimi-

nation. 639 F.2d 1358, 1363 (5th Cir.1981). Similarly, the most reasonable explanation for the two-tiered election scheme and the absence of a south Terrell polling place is discrimination. Thus, those three factors present strong, albeit indirect, evidence of discriminatory intent.

Certain other factors reinforce the evidence of intent. The existence of past discrimination, overall unresponsiveness, election of a disproportionately low number of minority representatives, and existence of racially polarized voting are of some significance. The Court, however, gives scant weight to the majority vote and anti-single shot factors.

■ The Court has carefully considered the factors that weigh in Defendant's favor. Considering the totality of the circumstances, however, the Court finds that the present election system in Terrell is maintained for the purpose of intentional, invidious discrimination. As such, it violates the Fourteenth and Fifteenth Amendments to the Constitution. *See, e.g., Rogers v. Herman Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Given the disposition of the constitutional issue, the Court need not address Plaintiffs' claims under Section 2 of the Voting Rights Act.

The parties are hereby directed to submit by April 29, 1983, a proposal or proposals for bringing Terrell's system for the election of its city council into compliance with the Fourteenth and Fifteenth Amendments of the Constitution.

SO ORDERED.