**Allie K. McCORD, et al.,**
**Plaintiffs-Appellants,**

v.

**CITY OF FORT LAUDERDALE, FLOR-**
**IDA, et al., Defendants-Appellees.**

No. 85–5288.

United States Court of Appeals,
Eleventh Circuit.

April 29, 1986.

David M. Lipman and Robert E. Weisberg, Lipman & Weisberg, Miami, Fla., for plaintiffs-appellants.

Mark R. Boyd, Ft. Lauderdale, Fla., and Vincent R. Fontana, Wilson, Elser, Edelman & Dicker, New York City, for defendants-appellees.

Before FAY and VANCE, Circuit Judges, and SWYGERT *, Senior Circuit Judge.

VANCE, Circuit Judge:

In this case plaintiffs, six black citizens of Fort Lauderdale and the Southern Christian Leadership Conference of Broward County, Florida, appeal the district court's ruling that the at-large election system for electing city commissioners in Fort Lauderdale does not violate the Voting Rights Act, 42 U.S.C. § 1973. 617 F.Supp. 1093. After reviewing the extensive factual record, we affirm.

## I. FACTUAL BACKGROUND

The city of Fort Lauderdale, incorporated in 1911, has been governed throughout its existence by a mayor-council or mayor-commission form of government. The Fort Lauderdale City Commission has five members. Election of these members has been under an at-large system since 1911. Fort Lauderdale has a primary and then a general election, with plurality vote determining the winners in both of these phases. In the primary election, the ten candidates who receive the highest vote totals become candidates in the general election. The top five finishers in the general election become city commissioners, and currently they serve three-year concurrent terms.[1] Voters may vote for up to five candidates in both phases of the election. Fort Lauderdale does not have a district or ward residency requirement for commissioner candidates and has not had one since 1947. The election system does not prohibit single-shot voting, nor does it contain a requirement for majority vote. Fort Lauderdale does not have and has never had a segregated primary.

Blacks in Fort Lauderdale comprise twenty-one percent of the city's total population.[2] Since 1911 a black commissioner has been elected three times, with the same individual, Andrew De Graffenreidt, winning in 1973 and being re-elected in 1975 and 1977.[3] In its analysis of black participation in Fort Lauderdale's city commissioner election system, the district court focused its attention on elections held between 1970 and 1982 because in the court's opinion black candidacies "prior to about 1970 appeared to be largely a testing of the political waters" rather than serious efforts at seeking election.[4] In addition to Mr. De Graffenreidt's success as a black candidate, the district court noted that in 1982 another black candidate, Arthur Kennedy, lost by a narrow margin of about three percent of the total votes cast.

## II. DISCUSSION

Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of

---

* Honorable Luther M. Swygert, Senior U. S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. The candidate receiving the highest number of votes is declared to be the mayor-commissioner. In the 1979 election the race for mayor was held at-large but separately from the at-large election of the other four commissioners. In 1982, however, Fort Lauderdale returned to its system of all five commissioners being elected at-large with no separate election for mayor.

2. The population of Fort Lauderdale according to the 1980 census was 153,279, 32,225 of whom were black.

3. City commissioners from 1951 to 1979 served two-year concurrent terms.

4. The district court in its opinion reviewed the black candidates for city commissioner prior to 1970 and attributed their lack of success variously to limited campaigning, lack of experience, and Democratic party affiliation in elections in which Republicans dominated. The court noted that according to Andrew De Graffenreidt the 1967 campaign by a full slate of five black candidates was directed at determining whether black voters would go to the polls.

The court also timed the release of its order so as not to affect the 1985 city elections nor be affected by the results of those elections.

race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The 1982 amendment to section 2 eliminated the requirement of showing discriminatory intent, and section 2 now provides a results test in vote dilution cases.

To determine whether blacks had been denied equal access to the political process in Fort Lauderdale the district court examined the plaintiffs' racial vote dilution claim in the context of the totality of circumstances present in the city. The district court was aided in its efforts by the 1982 Senate Report accompanying the amendment to section 2, which provides a list of nine "typical" factors to be considered under the totality of circumstances approach. These factors have been adopted and applied in this circuit, *see, e.g., United States v. Dallas County Commission,* 739 F.2d 1529, 1534–35 (11th Cir.1984), and they are as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 206–07 (footnotes omitted). The Senate Report further indicates, and this circuit has recognized, that this list of "typical" factors is not exclusive, and there is no requirement that any particular number of them be proved or that a majority of them point either way in a section 2 claim. *Id.* at 29, *reprinted in* 1982 U.S. Code

Cong. & Ad. News at 207; *Dallas County,* 739 F.2d at 1534 n. 2.

▮ The district court considered all nine factors and concluded that under the totality of circumstances standard the plaintiffs had failed to establish that Fort Lauderdale's at-large system of electing city commissioners violated section 2 of the Voting Rights Act, as amended. We are convinced that the district court applied the proper legal standards, and our task now is to review the district court's findings of fact to determine whether they are clearly erroneous. *See Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); Fed.R.Civ.P. 52(a).[5]

We begin our review by noting some guidelines set down by this court in *United States v. Marengo County Commission,* 731 F.2d 1546 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984):

> First, discriminatory intent need not be shown to establish a violation. Second, at-large elections are not prohibited per se, nor does a lack of proportional representation automatically require a finding of a violation. At the same time, however, the absence of minority elected officials may be considered as an indicium of violation, and an at-large system will violate the statute *if* it results in a denial of equal participation.... Third, section 2 focuses not on whether minority groups receive adequate public services but on whether minorities have an equal right to *participate* in the political process.

*Id.* at 1564–65 (footnotes omitted). With these principles in mind we turn to consideration of Fort Lauderdale's at-large election system. Concerning the first Senate Report factor, the district court stated that "[t]here is no reason to conclude from the evidence in this case that the official dis-

crimination, either in the State of Florida or in Fort Lauderdale, has adversely affected the right of the members of the plaintiff minority group either to register or to vote or otherwise to participate in the democratic process." We conclude that this finding is not clearly erroneous, especially in light of the evidence presented that blacks in Fort Lauderdale since 1970 have turned out to vote in higher numbers on a percentage basis than white voters in every election but one. This case is unlike *Marengo County,* in which we held that the blacks' political influence in that county was significantly hindered by their status of being poorer and less educated than whites. In *Marengo County* past discriminatory practices carried with them lingering effects on blacks' ability to participate in the political process as evidenced by the fact that blacks in that county registered to vote and voted in substantially lower numbers than whites. *See id.* at 1568–69. This case is more analogous to *Collins v. City of Norfolk,* 605 F.Supp. 377 (E.D.Va.1984), *aff'd,* 768 F.2d 572 (4th Cir.1985), in which the court stated:

> The Court has found that although there is a past history of official discrimination in Virginia affecting the right of blacks to participate in the electoral process, there are no lingering effects of that discrimination which prevent Norfolk's black citizens from participating in the electoral process today. Norfolk's black citizens register to vote and turn out to vote at rates equal to or greater than that of Norfolk's white citizens when measured as a percentage of voting age population.

*Id.* at 402 (footnote omitted). We note that evidence of past discrimination in Fort Lauderdale does exist, but we conclude that the district court's finding that such

---

**5.** The fifth circuit has stated:

> The district court's factual findings in voting dilution cases represent "a blend of history and an intensely local appraisal of the design and impact of the ... multi-member district in the light of past and present reality, political and otherwise." *White v. Register,* 412 U.S. 755, 769–70, 93 S.Ct. 2332,

2341, 37 L.Ed.2d 314 (1973).... We have no doubt that the finding of discriminatory effect or result under the Voting Rights Act amendments of 1982 is ... governed by the clearly erroneous standard.

*Velasquez v. City of Abilene,* 725 F.2d 1017, 1020–21 (5th Cir.1984).

discrimination has not been a clear impediment to the ability of blacks in Fort Lauderdale to participate in the political process is not clearly erroneous.

 After considering the second Senate Report factor and reviewing what it termed a "battle of expert witnesses with widely divergent conclusions," the district court found that the plaintiffs had failed to show that voting in the elections in Fort Lauderdale was racially polarized. The plaintiffs had presented various statistical theories which they asserted showed racially polarized voting, but had relied principally on a bivariate regression statistical analysis. This bivariate analysis produces an $R^2$ coefficient which correlates the percentage of a particular racial group registered in a given precinct with the percentage of the precinct vote for the candidates of that racial group. The district court found that when "tested against some actual events and realities,"[6] the bivariate analysis was less useful in this case than a multi-variate analysis which examined the voting patterns in the context of a number of independent variables including incumbency of the candidate, campaign funds spent, newspaper endorsements, voter turnout either in the black or white community, the portion of the registered voters who were black, and the sex of the candidate. The defendants' expert presented a multi-variate analysis which demonstrated that when race was added to other independent variables applied to voting statistics for past city commission races, the race factor explained only .6 of one percent of the dependent variables of candidate success, thus leading defendant's expert and the district court to conclude that race was not a statistically significant variable.

The plaintiffs argue that because the bivariate $R^2$ coefficient analysis has been used in previous vote dilution cases in this circuit, *see, e.g., NAACP v. Gadsden County School Board,* 691 F.2d 978, 983 (11th Cir.1982), the district court improperly rejected it here, and they assert that the court erred when it applied a multi-variate analysis to Fort Lauderdale's elections. We are not persuaded that the district court's findings concerning the lack of racially polarized voting in Fort Lauderdale are clearly erroneous. We have previously cautioned "against placing too much reliance solely on the $R^2$ coefficients in ruling on the issue of racially polarized voting." *Lee County Branch of the NAACP v. City of Opelika,* 748 F.2d 1473, 1482 (11th Cir.1984). In *Lee County* we quoted the following remarks from Judge Higginbotham which we find applicable to this case as well:

> Care must be taken in the factual development of the existence of polarized voting because whether polarized voting is present can pivot the legality of at-large voting districts. The inquiry is whether race or ethnicity was such a determinant of voting preference in the rejection of black or brown candidates by a white majority that the at-large district, with its components, denied minority voters effective voting opportunity. In answering the inquiry, there is a risk that a seemingly polarized voting pattern in fact is only the presence of mathematical correspondence of race to loss inevitable in such defeats of minority candidates.

*Jones v. City of Lubbock,* 730 F.2d 233, 234 (5th Cir.1984) (Higginbotham, J., specially concurring), *quoted in Lee County,* 748 F.2d at 1482. When analyzing racial polarization in voting it is important to realize that no one statistical theory is appropriate for all vote dilution cases. Care must be taken to examine each case individually while keeping in mind the section 2 "totality of circumstances" approach. Statistics can be very useful analytically but they also can be quite deceiving if applied narrowly and automatically without the proper scope. We have previously stated that "[i]t will often be necessary to examine factors

---

**6.** The district court criticized the plaintiffs' expert's bivariate analysis as a "methodology more suited for head-to-head elections" and cited problems with the theory in that it has an artifi- cial upper limit and depends on the number of minority candidates in the election, even if the voter attitude remains the same.

other than race that may also correlate highly with election outcomes—campaign expenditure, party identification, income, media advertising, religion, name recognition, position on key issues, and so forth." *Lee County*, 748 F.2d at 1482. We have also recognized the potential usefulness of a multiple regression analysis such as that used in this case. *See id.* We accept the district court's rejection of a bivariate analysis and application of a multi-variate analysis not because this is the proper analysis for all cases but because under the totality of the circumstances present in the Fort Lauderdale election system it was not clearly erroneous for the court to take this approach to determine whether voting in Fort Lauderdale was racially polarized.

We turn now to the other seven Senate Report factors considered by the district court and address them in summary fashion. Concerning these seven factors we hold that the district court's findings of fact regarding them are not clearly erroneous, and we make the following observations. It is significant that Fort Lauderdale has no anti-single shot voting policy, no residency requirements, and no segregated primaries. It is apparent also that black candidates have experienced some success in Fort Lauderdale considering Mr. De Graffenreidt's three victories and Mr. Kennedy's near miss. In four elections other than the city commission elections black candidates received a majority of the votes cast in the white precincts of Fort Lauderdale. These successful black candidates included Joseph Hatchett in the 1976 non-partisan primary for the Florida Supreme Court, Alcee Hastings in the 1974 Democratic primary for the Public Service Commission, and Andrew De Graffenreidt in the 1978 general election for the Broward County Commission. Fort Lauderdale presented evidence that the city was and is making efforts at alleviating the effects of discrimination in the areas of education, employment, housing, and health. The plaintiffs were unable to establish that any slating process in Fort Lauderdale existed that denied access to blacks. The evidence did not show that

Fort Lauderdale's elected officials were unresponsive to the needs of the black community. In sum, much of the evidence pointed to the validity of Fort Lauderdale's election system. After an extensive review of the record we conclude that the district court's findings of fact are not clearly erroneous. We therefore affirm the decision that under the totality of the circumstances blacks are not effectively denied the opportunity to participate in the political process in Fort Lauderdale and to elect the representatives of their choice.

AFFIRMED.

SWYGERT, Senior Circuit Judge, dissenting:

In essence, plaintiffs' case is that Fort Lauderdale's blacks have been denied access to the political processes of Fort Lauderdale in violation of Section 2 of the Voting Rights Act through a history of discrimination resulting in present socio-economic disadvantages, an absence of elected black officials, and the existence of racially-polarized voting. I believe that plaintiffs have proved their case, and I would reverse the district court's decision holding that they have not.

I

The majority begins by observing that: "Fort Lauderdale does not have and has never had a segregated primary." *Ante* at 1529. Presumably, this statement is intended to show that Fort Lauderdale is a different, better community from those whose history of racial discrimination has justified federal intervention into their electoral processes.

The majority does not mention that from 1922 to 1948 the City segregated blacks, by law, into the northwest area of the City—the so-called "Negro district." The majority also does not mention that for years Fort Lauderdale required its citizens to pay a poll tax before permitting them to vote, that blacks were long forced to use separate health facilities, and that blacks were forbidden until well into the 1960's from

using the City's parks, beaches and municipally-owned golf and country club.

Federal courts have been forced to act to remedy some of the most flagrant instances of discrimination. In 1957 the United States Court of Appeals for the Fifth Circuit ruled that the systematic exclusion of blacks from municipal golf courses was unconstitutional. *Fort Lauderdale v. Moorhead*, 248 F.2d 544 (5th Cir.1957). The City sold its golf course. In 1980 the United States District Court for the Southern District of Florida ordered the City to increase employment opportunities for blacks in the police and fire departments. *United States v. City of Fort Lauderdale*, No. 80–6289–CIV–ALH (S.D.Fla.1980). In *Allen v. Board of Public Instruction of Broward County*, 432 F.2d 362 (5th Cir. 1970), *cert. denied*, 402 U.S. 952, 91 S.Ct. 1609, 29 L.Ed.2d 123 (1971), the Fifth Circuit ordered the desegregation of Fort Lauderdale's public schools.

The majority concedes "that evidence of past discrimination in Fort Lauderdale does exist." *Ante* at 1531. The district court also recognized that "there was evidence of discrimination againt blacks in the City of Ft. Lauderdale in the past." Rec. at 36. Fort Lauderdale is a city where the most critical aspects of life were historically segregated by race, and where "vestiges of racism encompass the totality of life." *Lodge v. Buxton*, 639 F.2d 1358, 1381 (5th Cir.1981), *aff'd sub. nom. Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Jim Crow was alive and well in Fort Lauderdale and his only effective enemy has been the federal courts. Fort Lauderdale never had a segregated primary because it never needed one. Blacks no longer drink from separate fountains. But no one has suggested that race is still not a critical factor in whether one succeeds or fails in Fort Lauderdale society. "[T]he continuing effects of past discrimination are still with us." *United States v. Marengo County Commission*, 731 F.2d 1546, 1571 (11th Cir.), *cert. denied*, —— U.S. ——, 105 St.Ct. 375, 83 L.Ed.2d 311 (1984). "When the more blatant obstacles to black access are struck down ... an at-large plan may [nevertheless] operate to devalue black participation." *Jones v. City of Lubbock*, 727 F.2d 364, 386 (5th Cir.1984).

Almost ninety percent of blacks live within or immediately adjacent to the old Negro district. By the City's admission these blacks live in what can only be described as "slum" conditions. The average income for all Fort Lauderdale families is $15,410. The average income for black families is $9,760. One out of every three black adults has an eighth grade education or less. Blacks lag behind whites in every commonly accepted indicator of socio-economic progress. Between 1911 and 1986 only one black has been elected to the Fort Lauderdale City Commission. The law is clear: "When there is clear evidence of present socio-economic or political disadvantage resulting from past discrimination, the burden is on defendants to show that reduced political participation is the result of something besides this discrimination." *McMillan v. Escambia County*, 748 F.2d 1037, 1044 (5th Cir.1984). "Once [the] lower socio-economic status of blacks has been shown there is no need to show the causal link of this lower status on political participation." *United States v. Dallas County Commission*, 739 F.2d 1529, 1537 (11th Cir.1984). *See also Lodge v. Buxton*, 639 F.2d at 1378–79.

In its assessment of the success rate of black candidates for the City Commission, the district court considered only elections between 1971 and 1982 because "serious efforts in a black candidacy began about that time." Rec. at 26. This merely begs the question. The reason no "serious" black candidacies emerged before 1971 is because any reasonable person, black or white, would have considered the prospects for success of such a candidacy virtually nil. "[T]he lack of black candidates is a likely result of a racially discriminatory system." *McMillan v. Escambia County*, 748 F.2d at 1045. The quixotic character of pre-1971 black candidacies should operate in plaintiffs' favor. The district court instead used it to arbitrarily and artificially limit their case.

The majority states that "a black commissioner has been elected three times." *Ante* at 1529. This is true, but misleading. The parties have agreed that open seats—seats with no incumbent running—are the key races in determining electability. Rec. at 27. In any event, this court has previously noted that "... the election of one or a small number of minority elected officials will not compel a finding of no dilution." *Marengo County,* 731 F.2d at 1572. *See also Velasquez v. City of Abilene,* 725 F.2d 1017, 1022 n. 1 (5th Cir.1984).

I am loathe to enter the debate over the proper means of measuring racial polarization. *Compare NAACP v. Gadsden County School Board,* 691 F.2d 978, 983 (11th Cir.1982), *with Lee County Branch of the NAACP v. City of Opelika,* 748 F.2d 1473, 1482 (11th Cir.1984). I agree that the proper inquiry "is whether race or ethnicity was such a determinant of voting preference in the rejection of black or brown candidates by a white majority that the at-large district, with its components, denied minority voters effective voting opportunity." *Jones v. City of Lubbock,* 730 F.2d 233, 234 (5th Cir.1984) (Higginbotham, J., specially concurring). I also agree that neither bivariate or multivariate analysis will always be appropriate for all vote dilution cases. *See ante* at 10. There is no question, however, that some form of bivariate analysis has been the preferred statistical method of evaluating claims of racial polarization. *See, e.g., McMillen v. Escambia County,* 748 F.2d at 1043 n. 12; *Jones v. City of Lubbock,* 727 F.2d at 380–81; *Gingles v. Edminsten,* 590 F.Supp. 345, 367–68 n. 32 (E.D.N.C.1984); *Major v. Treen,* 574 F.Supp. 325, 337–39 (E.D.La.1983). Moreover, at least in Fort Lauderdale, the additional factors that must be examined under a multivariate analysis—campaign expenditure, identification, income, media advertising, religion, name recognition, position on key issues—are also closely correlated to race. It is a fair bet that blacks spend less on their campaigns and on media advertising because the overwhelming majority of their contributors are black and poor. This court has previously stated that bloc voting may be indicated by a showing of past discrimination in general including "the consistent lack of success of qualified black candidates." *Marengo County,* 731 F.2d at 1567 n. 34. Irrespective of the relative utility of bivariate and multivariate analysis the truth is that if the members of the Fort Lauderdale City Commission were elected by five single-member districts, there would be four white commissioners and one black. Racial polarization exists if "whenever a black challenges a white for countywide office, a consistent majority of the whites who vote will consistently vote for the black's opponent." *McMillan v. Escambia County,* 748 F.2d at 1043. These are the facts of political life in Fort Lauderdale. The "day has not come" when elections in Fort Lauderdale "are conducted without regard to the race of the candidates." *Marengo County,* 731 F.2d at 1567. Plaintiffs need not prove with absolute mathematical precision the existence of racially-polarized voting patterns in a city which has a long and irrefutable history of racial discrimination. "Racial polarization need not be perfect to be persuasive." *Political Civil Voters Organization v. City of Terrell,* 565 F.Supp. 338, 349 (N.D.Tex.1983). Even if plaintiffs had not clearly established the existence of racially-polarized voting, I would have employed the procedure utilized in *Lee County Branch of the NAACP v. City of Opelika* and remanded to the district court to permit the parties to introduce evidence concerning the degree of racially-polarized voting. 748 F.2d at 1482–83.

## II

In Fort Lauderdale black voter turnout is higher than that of whites. *Ante* at 1531; Rec. at 38–39. In that respect Fort Lauderdale does not quite exhibit the pattern we have come to expect from cities charged with voting rights violations. Nevertheless, I believe the majority has exaggerated the importance of high black voter turnouts, and that a finding of comparatively low black voter turnouts is not a necessary prerequisite to a Section 2 violation.

We are called upon in this case to determine whether a right of participation in the political process guarantees nothing more than a right to cast a vote. We must decide whether it can ever be said that blacks have been denied access to the political process when it is established that they register and vote in numbers proportionately greater than that of whites. Without quite saying so the majority today decides that evidence that blacks actually succeed in voting as often as whites constitutes *prima facie* proof that the political process is working and that no violation of the Voting Rights Act has occurred. I believe the majority would have found a violation of the Voting Rights Act and reversed the district court but for the voting patterns of Fort Lauderdale's blacks. Thus, in essence, this court penalizes the City's black citizens for doing nothing more than exercising perhaps the most fundamental of all constitutional rights: the right to vote. This cannot be the law.

There is no question that the underlying purpose of the 1982 Voting Rights Act Amendments is to insure that "political processes are equally open to minority voters." S.Rep. No. 417, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News 179 (hereinafter Senate Report). Equal access to the political process is not established, however, merely by the fact that blacks succeed in registering themselves to vote in the same degree as whites. "Inequality of access is an inference which flows from the existence of economic and educational inequalities." *Kirksey v. Board of Supervisors of Hinds County, Mississippi,* 554 F.2d 139, 145 (5th Cir.) (en banc), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). The legislative history of the 1982 Amendments suggests that the focus ought not to be confined to registration and voting statistics.

The initial effort to implement the Voting Rights Act focused on registration. More than a million black citizens were added to the voting rolls from 1965 to 1972. It is not surprising, therefore, that to many Americans, the Act is synonymous with achieving minority regis-tration. But registration is only the first hurdle to full *effective* participation in the political process. As the Supreme Court said in its interpretation of the Act:

> "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot."

*Quoting Allen v. Board of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969).

Senate Report at 6, *reprinted in* 1982 U.S. Code Cong. & Ad.News at 183 (emphasis added). The right to vote was never intended to be an exercise in futility. The legislative history notes that "there still are some communities in our Nation where racial politics do dominate the electoral process. In the context of such racial bloc voting ... a particular election method can deny minority voters equal opportunity to participate *meaningfully* in elections." *Id.* at 33, reprinted in 1982 U.S.Code Cong. & Ad.News at 211 (emphasis added). It seems clear that the Voting Rights Act Amendments were intended to do more than establish an abstract right to participate in the political process—a right measured in isolation from the results of that participation. The right of access guaranteed by the Voting Rights Act must be *meaningful* and it must be *effective.*

This court has previously recognized the importance of giving practical effect to the underlying purpose of the Act. In the leading case interpreting the 1982 Amendments, a case relied on heavily by the majority, the court endorsed the view that "access" under the Act must be more than formal.

> The defendants contend that it is "abundantly clear" that section 2 protects only "access to the political processes." We reject any assertion that the statute as amended applies only to formal barriers to access such as literacy or residency tests. The goal of the Voting Rights Act has always been to ensure an *effective* right of participation. That this continues to be the case is made "abundantly

clear" by the words of the amended statute and its history. The statute is violated if a protected class has "less opportunity than other members of the electorate to participate in the political process *and to elect representatives of their choice."*

*Marengo County,* 731 F.2d at 1556 (emphasis added).

The extent to which blacks have actually been elected to office may thus unquestionably be considered in determining whether a violation of the Act has occurred. 42 U.S.C. § 1973(b). Their success is an important measure of whether *meaningful* black access to the political process has been achieved.

Until today courts had never viewed black voter turnout or registration rates as dispositive of a claim under the Voting Rights Act. In *United States v. Dallas County Commission,* this court upheld a district court finding "that blacks are now registered in substantially equal numbers with whites," but nevertheless found that a violation of the Act had occurred. 739 F.2d at 1538. In *McMillan v. Escambia County,* a Florida case, the court observed "no significant difference currently existing between black and white voter registration," 784 F.2d at 1045, but nevertheless held that the record established a clear violation of Section 2. In *Political Civil Voters Organization v. City of Terrell,* despite evidence that blacks in Terrell, Texas were registered to vote in significantly higher proportions than whites, the court found that the city's at-large election system violated the fourteenth and fifteenth amendments. 565 F.Supp. at 342. In *Marengo County* this court stated that past discrimination leading to present socio-economic disadvantages "can reduce participation and influence in political affairs." 731 F.2d at 1567. The socio-economic situation was evaluated independently of registration rate and voter turnout statistics. *Id.* Moreover, we have no right to assume that black voter registration rates in Fort Lauderdale would not be higher but for the lingering effects of past discrimination.

The interest of whites in the democratic process may not necessarily represent the upper limit of black interest in the process.

In analyzing a claim of vote dilution under Section 2 courts must consider a list of nine "typical factors" derived from *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *Marengo County,* 731 F.2d at 1565 n. 32. *One* of those factors is the extent to which a history of official discrimination affects the right of a minority group to register or vote. Senate Report at 28, *reprinted in* 1982 U.S.Code Cong. & Ad. News at 206. But the rate of minority registration and voting is only one factor that must be considered in determining whether there has been a denial of access to the political process. As the majority notes a denial of the participatory rights protected by the Act must be proved by a "totality of circumstances." *Ante* at 1530. No single factor, standing alone, is dispositive. Today's decision, however, strongly suggests that unless plaintiffs in a Voting Rights Act case can prove that an election system has reduced black voter registration and turnout no violation of the Act is possible. There is no support for this proposition in the language of the Act or in the legislative history.

For authority the majority and the defendants rely on *Collins v. City of Norfolk,* 768 F.2d 572 (4th Cir.1985). In *Collins,* however, the Fourth Circuit viewed relatively high black voter turnout as one of many facts "which generally show[ed] improvement in the status and circumstances of blacks in Norfolk." 768 F.2d at 575. Unlike the majority in this case, the Fourth Circuit did not seek to establish poor black voter turnout as the *sine qua non* of a Section 2 violation. I am not prepared to say that conditions in Fort Lauderdale approximate those in the Norfolk merely because in both cities black voter turnout exceeds that of whites. Nevertheless, if

the Fourth Circuit in *Collins* viewed high black voter turnout as dispositive of the issue of black access to the political process then I must respectfully disagree with that court's view of the law.

At the same time, I cannot deny that both *Collins* and *McCord* raise important questions about the direction of the civil rights movement and, for that matter, about the nature of the right to vote. Can the political process be said to be open to blacks only if they actually succeed in electing black candidates? Are blacks alone qualified to represent other blacks? The logic of the NAACP Legal Defense Fund in this case, and of the Lawyer's Committee for Civil Rights Under Law in *Collins*, suggests that the answer to both those questions ought to be a resounding "yes." Yet, there is something disturbing about the position the civil rights bar has taken in these two cases. There is an inherent tension in the voting rights cases between the desire to insure that minority interests are adequately represented and the reluctance to institute a judicially-imposed system of *de facto* proportional rep-. resentation. "A district judge adopting districting plans to replace an invalidated at-large system must adhere to a middle road. While a court must avoid drafting a plan as a device for installing proportional representation, so also, the court cannot blind itself to the effect of its districting plan on racial groups." *Jones v. City of Lubbock*, 727 F.2d at 386. "[T]he tension between an impact-based test of lawfulness and a rejection of a right to proportional representation defies easy resolution." *Velasquez v. City of Abilene*, 725 F.2d at 1024 (Higginbotham, J., specially concurring). *See also Marengo County*, 731 F.2d at 1565 nn. 30–31. In a closely related context, one commentator has observed that "[t]wo fundamental values underlie the Supreme Court's debate about constitutional rights in voting: majority rule and minority representation." Note, *The Constitutional Imperative of Proportional Representation*, 94 Yale L.J. 163 (1984).

The Voting Rights Act tiptoes along the razor's edge demarcating these two con-flicting principles. It is not for us to alter the line drawn by Congress. Under the Voting Rights Act an at-large election plan is unlawful if there is a history of discrimination, if there is racially-polarized voting, and if minority groups are consistently underrepresented.

I would reverse the district court and remand with instructions to devise a remedy.